FLAUGHER ET AL., APPELLANTS, *v.*
CONE AUTOMATIC MACHINE CO. ET AL., APPELLEES.

[Cite as Flaugher *v.* Cone Automatic Machine Co. (1987),
30 Ohio St. 3d 60.]

(No. 86-929—Decided April 22, 1987.)

---

[1] Pneumo Corporation was then known as Pneumo Dynamics Corporation.

*Lindhorst & Dreidame Co., L.P.A.,* and *Jay R. Langenbahn,* for appellants.

*McCaslin, Imbus & McCaslin* and *R. Gary Winters,* for appellees.

DOUGLAS, J. The instant appeal presents this court with three separate questions. The first is whether either of the appellee corporations falls within a recognized exception to the traditional rule of successor nonliability. Secondly, we are urged to adopt the "product line" theory of liability as espoused in *Ray* v. *Alad Corp., supra.* The final question is

whether appellees had a duty to warn appellant of the alleged defect in the machine which injured her. Our analysis follows.

## I

The general rule in products liability is that a successor corporation's amenability to suit will depend on the nature of the transaction which gave rise to the change in ownership. 1 Frumer & Friedman, Products Liability (1983) 70.58(3), Section 5.06[2]. Where the transfer is accomplished by means of a statutory merger or consolidation, the liability of the former corporation will be assumed by the new entity. *Id.* Where there is merely a sale of a corporation's assets, the buyer corporation is not liable for the seller corporation's tortious conduct unless one of the following four exceptions applies:

(1) the buyer expressly or impliedly agrees to assume such liability;

(2) the transaction amounts to a *de facto* consolidation or merger;

(3) the buyer corporation is merely a continuation of the seller corporation; or

(4) the transaction is entered into fraudulently for the purpose of escaping liability. *Id.* at 70.58(4); *Burr* v. *South Bend Lathe, Inc.* (1984), 18 Ohio App. 3d 19, 18 OBR 43, 480 N.E. 2d 105; Annotation, Products Liability: Liability of Successor Corporation for Injury or Damage Caused by Product Issued by Predecessor (1975), 66 A.L.R. 3d 824.

The transfer under scrutiny here, *i.e.,* the purchase of PDMTG (which included the assets of Cone I, the actual manufacturer of the machine in question) and Cone II by appellee Cone-Blanchard, was a "sale of assets" transaction. Thus, Cone-Blanchard is not liable unless one of the above four exceptions applies.

Appellants concede that the second and fourth exceptions above are inapplicable. They contend, however, that the first and third exceptions exist under these facts.

Appellants' argument regarding the first exception is that the purchase agreement between Pneumo Corporation, Cone I's sole successor, and Cone-Blanchard is ambiguous as to whether Cone-Blanchard intended to assume tort liability for products manufactured by Cone I, and that such ambiguity should be construed in appellants' favor. However, our examination of the pertinent portions of the purchase agreement reveals that no ambiguity exists. Cone-Blanchard did not contract to assume liability for the alleged tortious conduct of Cone I.

Section 6.2 of the agreement[2] provides that Cone-Blanchard shall

---

[2] Section 6.2 provides:

"Indemnification of Buyer for Extraordinary Damages. Beginning on the Closing Date Buyer shall assume any liability of Seller for any damages to any person or property arising or alleged to arise (a) out of any breach of warranty, expressed or implied, made by Seller in connection with the sale of machines or parts therefor or (b) out of the negligence or willful misconduct of Seller in the manufacture of such machines or parts therefor, but only to the

assume any liability incurred by Pneumo Corporation arising from any breach of warranty *made by Pneumo,* or from any negligence or willful misconduct *of Pneumo,* to the extent covered by Cone-Blanchard's insurance. This section clearly and unambiguously limits Cone-Blanchard's assumption of liability to any liability stemming from Pneumo's own acts or omissions. The alleged defect in the machine in question is chargeable only to Cone I, its actual manufacturer.

Section 5.2[3] provides that Pneumo shall indemnify Cone-Blanchard for all claims against PDMTG asserted after the effective date of the agreement "arising out of any transaction entered into, or any state of facts existing" prior thereto, where liability for such claims has not already been assumed by Cone-Blanchard elsewhere in the contract. This section unambiguously relieves Cone-Blanchard of any liabilities predating the purchase agreement which are not expressly assumed by Cone-Blanchard.

Section 5.1 specifically limits the liabilities assumed by Cone-Blanchard to those expressly enumerated in that section,[4] none of which applies to the instant cause.

---

extent covered by Buyer's insurance. Buyer's insurance at the Closing Date shall provide the following coverage:

| "$500,000/$2,000,000 | Bodily Injury |
| "$500,000 | Property Damage |
| "$5,000,000 | Umbrella — excess over primary coverage |

"Seller shall indemnify and hold Buyer harmless after the Closing Date and shall assume the defense of any claim asserted against and with respect to all such damages and all costs or expenses related thereto to the extent not covered by Buyer's insurance." (Underscoring *sic.*)

[3] This section provides:

"Indemnification. Seller shall indemnify and hold Buyer harmless and shall assume the defense of any claim being asserted after the Effective Date against and in respect of all liabilities and obligations, costs and expenses in excess of $20,000 of the Machine Tool Group related to the Business of any nature, whether accrued, absolute, contingent, or otherwise existing on the Effective Date or arising out of any transaction entered into, or any state of facts existing, prior to the Effective Date, to the extent (i) not included in Clauses (a), (b), (c), (d) and (e) of Section 5.1, and assumed by Buyer pursuant to the provisions of Section 5.1, (ii) not reflected on the balance sheet for Cone for the fiscal year ending November 30, 1972 referred to in Clause (b) of Section 4.1 or not incurred by Cone in the ordinary course of business in operating the Business for the account of Buyer in compliance with the terms of this Agreement from the Effective Date to the Closing Date, except all such balance sheet liabilities and other such liabilities paid or discharged on or before the Closing Date, or (iii) not referred to in the Document List. Notwithstanding any of the foregoing provisions of this Section 5. or any other provision of this Agreement, Buyer shall not assume and does not assume any liability or obligation of Seller or Cone with respect to any retirement benefits or pension benefits which Seller or Cone has agreed to pay any employee outside of, or in addition to, any of the pensions, retirement plans or arrangements of Seller or Cone referred to in the Document List." (Underscoring *sic.*)

[4] Section 5.1 states:

It is evident from the foregoing that Cone-Blanchard did not expressly or impliedly assume any liability for injury caused by defective machines manufactured by Pneumo's predecessor, Cone I. Thus, the "assumption of liability" exception has no bearing here.

Nor does the "mere continuation" exception find application under these facts. In no way can the buyer, Cone-Blanchard, be characterized as a mere continuation of the seller, Pneumo Corporation, or of the seller's predecessor, Cone I.

"The gravamen of the traditional 'mere continuation' exception is the continuation of the *corporate entity* rather than continuation of the business operation." (Emphasis *sic.*) 1 Frumer & Friedman, *supra,* at 70.58(12), Section 5.06[2][c]. The exception has been narrowly construed to protect corporations from unassumed liabilities. *Id.* at 70.58(13), Section 5.06[3]. Those courts which have expanded this exception have done so on the basis of significant shared features between the buyer and the seller, such as the same employees, a common name, or the same management. See, *e.g., Cyr* v. *B. Offen & Co.* (C.A. 1, 1974), 501 F. 2d 1145, 1153-1154 (same employees continued after transfer of ownership to produce same product, in same plant, with same supervision); *Turner* v.

---

"Assumption of Liabilities. On the Closing Date, Buyer shall assume and agree to pay, perform and discharge as and when due the following:

"(a) All liabilities of PDMTG reflected on the balance sheet for PDMTG for the fiscal year ending November 30, 1972, referred to in Clause (a) of Section 4.1, and all liabilities incurred by PDMTG in the ordinary course of business in operating the Business for the account of Buyer in compliance with the terms of this Agreement from the Effective Date to the Closing Date except all such balance sheet liabilities and other such liabilities paid or discharged on or before the Closing Date.

"(b) All obligations and liabilities of PDMTG as of the Effective Date under all open sales contracts and purchase contracts referred to in the Document List attached hereto as Exhibit 'B'.

"(c) All obligations and liabilities of PDMTG as of the Effective Date under all other contracts, plans, agreements and commitments referred to in the Document List, except any obligation of PDMTG under Seller's Salaried Employee's Pension Plan for certain salaried employees of PDMTG (as to which special provision is made in Section 16.)

"(d) Buyer shall also assume Seller's liability under certain guarantees of borrowings in British Pounds made by Cone from the London branches of Chase Manhattan Bank N.A., Manufacturers Hanover Trust Company and the First National Bank of Boston not exceeding 600,000 British Pounds. Buyer agrees to use its best efforts to secure a release of Seller from its present guarantee of said borrowings.

"(e) All written product guarantees and warranties to the extent specified in Section 6.1.

"The assumption of liabilities and obligations contemplated by this Section 5.1 shall be effected by the execution and delivery by Buyer to Seller on the Closing Date of an assumption of liabilities in the form of the Assumption Of Liabilities attached hereto as Exhibit 'C'. Notwithstanding the foregoing provisions of this Section 5.1, Buyer shall not assume any obligations or liabilities not described in Clauses (a), (b), (c), (d) or (e) of this Section 5.1 or which Buyer and Seller have expressly agreed shall not be assumed by Buyer as shown in the Document List even though referred to in the Document List." (Underscoring *sic.*)

*Bituminous Cas. Co.* (1976), 397 Mich. 406, 244 N.W. 2d 873 (retention of key personnel and trade name). The reasoning behind this expanded view of continuity is that where the successor corporation shares significant features with its predecessor, no basis exists for treating a purchase of assets differently from a *de facto* merger. *Id.* at 423, 244 N.W. 2d at 880. The cases have required that the predecessor be dissolved or liquidated soon after the transfer of assets. *Id.* at 419-420, 244 N.W. 2d at 878-879; *Bonee* v. *L & M Constr. Chemicals* (M.D. Tenn. 1981), 518 F. Supp. 375, 381.

It is obvious that even the expanded view of continuity has no application under these facts. Cone-Blanchard has no directors or officers in common with either Cone I or its sole successor, Pneumo Corporation. Cone-Blanchard does not consist solely of the assets of the long-defunct Cone I. It does not manufacture only Conomatic machines. Cone I, Pneumo's predecessor and the manufacturer of the machine in question, was dissolved in 1963, nine years *before* Cone-Blanchard bought PDMTG, which included Cone I's assets. Most importantly, Pneumo Corporation continued to exist as a viable business concern after the 1972 transfer. Clearly, there was a clean break between Cone-Blanchard and Pneumo Corporation such that the former cannot be considered a mere continuation of the latter or of the latter's predecessor, Cone I. In our extensive review of the applicable authorities, we could find no case imposing liability on a corporation as far removed from the actual manufacturer as Cone-Blanchard is from Cone I. We are not inclined to extend liability to Cone-Blanchard under any of the four exceptions to successor non-liability.

As for appellee Cone II, it is patently clear that neither the "assumption of liability" nor the "mere continuation" exception forms any basis for liability. The record discloses no document of any description which could possibly be characterized as an assumption by Cone II of the liabilities of Cone I arising from defectively manufactured machinery. Nor can the "mere continuation" exception apply, since Cone II is simply a holding corporation, entirely inactive, formed for the sole purpose of holding the Cone name and associated rights. It cannot be regarded as a mere continuation of Cone I, which was a manufacturing concern with employees, a place of business and a product line.

Accordingly, we hold that a corporation which purchases the assets of a manufacturer is not liable for injury resulting from a defective machine produced by that manufacturer unless there is an express or implied assumption of such liability, or the transaction constituting the sale of assets amounts to a *de facto* merger or consolidation, or the purchaser corporation is a mere continuation of the seller corporation, or the transaction is a fraudulent attempt to escape liability.

## II

In *Ray* v. *Alad Corp., supra,* the California Supreme Court created a fifth exception to the general rule of successor non-liability in a sale-of-

assets setting. This exception has come to be referred to as the "product line" theory, and appellants urge this court to adopt it for application in this case.

In *Ray,* a worker was injured in 1969 while using a defective ladder probably manufactured in 1952 by the since-dissolved "Alad I" Corporation which had sold all its assets in 1968 to "Alad II" Corporation. None of the four exceptions to successor non-liability was found to apply. However, the court fashioned a fifth exception, which holds that a party that acquires a manufacturing business and continues the manufacture of its line of products assumes strict tort liability for injuries resulting from defects in units of the same product line previously manufactured and distributed. *Id.* at 34, 136 Cal. Rptr. at 582, 560 P. 2d at 11. In so holding, the court emphasized the policy in products liability law of insuring that the costs of injury be borne not by the innocent injured consumer, but by the manufacturer who can insure the risk and distribute the expense among the public as a cost of doing business. *Id.* at 30-31, 136 Cal. Rptr. at 579, 560 P. 2d at 8. It reasoned that the successor corporation in such a case enjoys the benefits of the good will associated with the product, so it is not inappropriate to require it to bear the burdens as well. *Id.* at 31, 136 Cal. Rptr. at 580, 560 P. 2d at 10-11.

*Ray* has not drawn an enthusiastic reception. A few courts have endorsed its reasoning. *Ramirez* v. *Amsted Indus., Inc.* (1981), 86 N.J. 332, 431 A. 2d 811; *Dawejko* v. *Jorgensen Steel Co.* (1981), 290 Pa. Super. 15, 434 A. 2d 106; *Bonee, supra.* Others disapprove its expansive approach. See, *e.g., Woody* v. *Combustion Engineering, Inc.* (E.D. Tenn. 1978), 463 F. Supp. 817; *Hernandez* v. *Johnson Press Corp.* (1979), 70 Ill. App. 3d 664, 388 N.E. 2d 778; *Bernard* v. *Kee Mfg. Co., Inc.* (Fla. 1982), 409 So. 2d 1047. Many of the federal cases decline to adopt *Ray* in applying the law of a particular state where such state has not spoken on the issue, since it represents such a far-reaching exception. See, *e.g., Leannais* v. *Cincinnati, Inc.* (C.A. 7, 1977), 565 F. 2d 437; *Rhynes* v. *Branick Mfg. Corp.* (C.A. 5, 1980), 629 F. 2d 409. Some courts have felt that this radical departure from traditional principles calls for legislative rather than judicial adoption. *Leannais, supra,* at 441; *Hernandez, supra,* at 669-670, 388 N.E. 2d at 782; *Burr, supra,* at 23, 18 OBR at 48, 480 N.E. 2d at 109.

We are inclined to agree that the expansion of corporate successor liability espoused in *Ray,* if it is to be considered by Ohio at all, would require legislative action. The adoption of the product line theory would cast a potentially devastating burden on business transfers and would convert sales of corporate assets into traps for the unwary. See *Woody, supra,* at 821. The consideration of whether the benefits of the product line theory outweigh its drawbacks is a matter best consigned to the legislature, with its "comprehensive machinery for public input and debate." *Leannais, supra,* at 441.

We hold, therefore, that the "product line" exception to corporate successor non-liability is a far-reaching and radical departure from traditional

principles, such that its adoption is a matter for the legislature rather than the courts.

### III

The final issue for our review is whether appellee Cone-Blanchard had a duty to warn of the defect alleged to exist in the machine which injured appellant. For the following reasons, we hold that it had no such duty.

A successor corporation may acquire a duty to warn where defects in a predecessor's products are brought to its attention. *Leannais, supra,* at 441-443; 1 Frumer & Friedman, *supra,* at 70.58(22)(a), Section 5.06[5]. This duty may arise regardless of the nature of the transaction transferring ownership since it is based not on the corporation's successor status but on its own knowledge of the defect. *Id.; Pelc* v. *Bendix Machine Tool Corp.* (1981), 111 Mich. App. 343, 358, 314 N.W. 2d 614, 621. The successor corporation must be shown to have had prior knowledge, actual or constructive, of the defect in question.

Appellants contend that Cone-Blanchard had the requisite prior notice of the defect which caused the injury by virtue of its receipt of a summons on March 16, 1979 notifying it of a Texas lawsuit alleging that the plaintiff therein had sustained an injury similar to that suffered by appellant due to a defect in a Conomatic machine. A review of the record reveals that the filing of this lawsuit was insufficient to constitute notice of the alleged defect in the machine which injured appellant.

The complaint in the Texas lawsuit was filed just five weeks before the occurrence of the incident which is the subject of this action and involved a different machine. At that time, appellee can fairly be said to have notice only of a single *allegation* that a defect in a *different machine* caused a similar injury. This court is not prepared to impose on appellee a duty to warn of a defect which had not yet been proven to exist, and which, even if proven, would not necessarily pertain to the machine which injured appellant.

Accordingly, we hold that a successor corporation has no duty to warn of defects in products manufactured by its predecessor unless the successor is shown to have had pre-existing knowledge, actual or constructive, of the particular defect alleged to exist. Even where such knowledge is lacking, however, the successor may still be liable for injuries resulting from its predecessor's defective products if any of the four exceptions to successor non-liability applies.

Based on the foregoing, we find that appellees are not liable to appellants under any theory. Therefore, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., LOCHER, HOLMES, WRIGHT and H. BROWN, JJ., concur.

SWEENEY, J., dissents.

SWEENEY, J., dissenting. The decision of the majority today would condition the tort liability of a successor corporation for the defective products of its predecessor upon the nature of the corporate acquisition as negotiated between the acquired and acquiring entities. The net result of such reasoning is to allow the contracting corporations to effectively foreclose the rights of innocent third parties to receive compensation for injuries occasioned by the introduction of defective products into the marketplace. Consequently, the burdens associated with the product are borne by the individual irrespective of the fact that she was neither privy to the negotiations resulting in the corporate acquisition nor in a position to protect herself from any ensuing harm wrought by the placement of the product in the stream of commerce. Any rule countenancing such an outcome is indefensible.

The embracement of the "traditional" approach to corporate successor liability by the majority ignores its business law foundations and its total irrelevance to the policy considerations underlying the law of products liability. The four enumerated exceptions to the rule denying successor liability of a corporation for the obligations of its predecessor were developed in the context of corporate, contract and tax law. Recognition of this fact has been manifested even by courts applying an expanded view of the continuity of enterprise exception. See *Cyr* v. *B. Offen & Co., Inc.* (C.A. 1, 1974), 501 F. 2d 1145, 1152. Accordingly, in *Ramirez* v. *Amsted Indus., Inc.* (1981), 86 N.J. 332, 341, 431 A. 2d 811, 815-816, the New Jersey Supreme Court remarked:

"Courts have come to recognize that the traditional rule of nonliability was developed not in response to the interests of parties to products liability actions, but rather to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions, as well as to determine successor corporation liability for tax assessments and contractual obligations of the predecessor."

In contrast to the majority's blind adherence to a rule of law unrelated and inapplicable to an action for personal injury, adoption of the product line theory would advance the protections afforded innocent third parties for injuries resulting from encounters with defective products. As stated in *Cyr, supra,* at 1154, the reasons behind the development of products liability law are:

"(1) the manufacturer is better able to protect itself and bear the costs while the consumer is helpless; (2) it is the manufacturer which has launched the product into the channels of trade; (3) it is the manufacturer which has violated the representation of safety implicit in putting the product into the stream of commerce; and (4) the manufacturer is the instrumentality to look to for improvement of the product's quality. To this we add the more traditional reason for imposing liability on a corporation for tortious injuries, the negligence of its employees."

Imposition of successor liability on a corporation for the defective

products introduced into the stream of commerce by its predecessor, therefore, is not dependent upon doctrines developed in the context of corporate acquisitions. Rather, any rule of successor liability must be predicated upon the public policy considerations which spawned the development of products liability law.

Each of the enumerated policy considerations identified by the *Cyr* court is served by permitting recovery against a successor corporation. The capacity of the corporation to better bear the costs of the defective product is often referred to as the ability to "spread the risk" of any ensuing injuries among the consumers of the product. Thus, in *Cyr, supra,* the court concluded:

"The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them." *Id.*

See, also, *Turner* v. *Bituminous Cas. Co.* (1976), 397 Mich. 406, 425, 244 N.W. 2d 873, 881; *Ray* v. *Alad Corp.* (1977), 19 Cal. 3d 22, 31, 136 Cal. Rptr. 574, 579-580, 560 P. 2d 3, 8-9; *Ramirez* v. *Amsted Indus., Inc., supra,* at 352, 431 A. 2d at 821.

Adoption of the product line theory also serves to advance the second policy foundation of products liability law. While it is undoubtedly true that the successor corporation was not the entity which "launched the product into the channels of trade," it is clearly the beneficiary of the product's status in the marketplace. With the benefits established by the product also come the burdens associated with that portion of the product line which is defective. This burden-benefit dichotomy was eloquently articulated by the *Cyr* court at 1154 which noted: "* * * [I]t is true that the successor, by definition, was not the legal entity which launched the product on the stream of commerce or made implied representation as to its safety. But in the most real sense it is profiting from exploiting all of the accumulated good will which the products have earned, both in its outward representations of continuity *and in its internal adherence to the same line of equipment.*" (Emphasis added.) Similarly, the Michigan Supreme Court stated in *Turner* v. *Bituminous Cas. Co., supra,* at 426, 244 N.W. 2d at 882: "Justice would be offended if a corporation which holds itself out as a particular company for the purpose of sales, would not be estopped from denying that it is that company for the purpose of determining products liability." See, also, *Ray* v. *Alad Corp., supra,* at 34, 136 Cal. Rptr. at 581-582, 560 P. 2d at 10-11; *Ramirez* v. *Amsted Indus., Inc., supra,* at 344-345, 431 A. 2d at 817; *Dawejko* v. *Jorgensen Steel Co.* (1981), 290 Pa. Super. 15, 26, 434 A. 2d 106, 111.

The desire of the Cone-Blanchard Machine Co. to capitalize on the good will generated by the Conomatic product line is beyond dispute. The

majority opinion has acknowledged as much by stating that acquisition of Cone II by Cone-Blanchard was undertaken even though Cone II was "simply a holding corporation, entirely inactive, formed for the sole purpose of holding the Cone name and associated rights." Despite the fact that acquisition of Cone II was motivated exclusively by a desire to exploit the good will associated with the Cone name, the majority permits Cone-Blanchard to disclaim such association when defective goods comprising a portion of the product line result in injuries to third parties. Thus, the majority has propounded a curious rule of liability which vests the benefits associated with a product line in the successor manufacturer and saddles the victim with its burdens.

Irrespective of the accumulated good will obtained through purchase of its predecessor, the acquiring corporation profits also from the expertise possessed by the acquired entity relative to the manufactured product. This, in part, explains the inclination of the purchasing corporation to obtain a going concern with an established management structure and an experienced labor force rather than attempting to create a comparable business *ab initio*. It is from this expertise that the public expects improved products in terms of safety. Thus, it was recognized in *Turner* v. *Bituminous Cas. Co., supra,* at 424, 244 N.W. 2d at 881, that " 'the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than the consumer.' * * *" The court therefore concluded: "This is a significant rationale for imposing strict liability for a defective product in the first place, *i.e.,* the manufacturer has superior ability to bear the cost of injuries *and is the only one who can improve the product's quality."* (Emphasis added.) *Id.* at fn. 6. See, also, *Cyr* v. *B. Offen & Co., Inc., supra,* at 1154; *Ray* v. *Alad Corp., supra,* at 30, 136 Cal. Rptr. at 579, 560 P. 2d at 8.

Consequently, the policy reasons behind imposing liability on the entity responsible for the quality of a particular product are served by adoption of the product line theory. The successor corporation, as the repository of the expertise possessed by the original manufacturer, is in the best position to improve the quality of the product. In this sense, it is as capable of meeting this obligation as the original company if that company had remained in operation and producing the same line of products. A corporate takeover does not alter this underlying fact.

The majority opinion, in reviewing prior case law, has noted that, for recovery to be obtained under the traditional continuation of enterprise exception, the predecessor corporation must have been "dissolved or liquidated soon after the transfer of assets." This observation illustrates the futility of applying a rule developed in a corporate law context to situations involving products liability. Tied as they were to the traditional corporate analysis of successor liability, even those courts applying the "mere continuation" doctrine nevertheless attempted to draw an analogy between those businesses continuing the corporate enterprise (*i.e.,* through

the purchase of the assets of the predecessor corporation, exception 3), and those into which the prior business was merged (exception 2). Thus, there was an emphasis placed on the extinguishment of the prior enterprise either through merger, *de facto* merger (assets-for-stock), or continuation of the enterprise (assets-for-cash). See the language of *Turner, supra,* at 427, 244 N.W. 2d at 883.

The Twelfth Appellate District and the trial court have relied on this vain attempt at symmetry for the proposition that dissolution of the prior corporation is a condition precedent for the imposition of liability on the successor — even in a products liability context. The trial court reasoned that the basis for this requirement is that the predecessor is "unavailable as a litigant." While the inability to sue the earlier corporation due to its dissolution may be a compelling argument in terms of justice for allowing an injured plaintiff to recover against the successor corporation, it is not the basis of the "continuation" exception. Rather, the requirement is merely a means to illustrate that, from a corporate sense, a cash-for-assets transaction that results in the ultimate dissolution of the predecessor corporation is the functional equivalent of a merger or *de facto* merger — the total absorption of the prior entity into its successor. Inasmuch as both exceptions arose in a corporate law context, they have no relevance to the policy underpinnings of products liability law.

Moreover, the discussion in the opinion of the trial court relative to the holding in *Ramirez, supra,* is not a correct statement of the product line doctrine. The court remarked: "In *Alad* and in *Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 431 A. 2d 811 (1981), a later case explicating the 'product line' doctrine, the predecessor corporation, as a result of its liquidation or dissolution prior to the injury, was unavailable as a litigant." The clear implication of this language is that, in jurisdictions applying the "product line" theory, the predecessor corporation must become defunct. This is not so. In *Nieves v. Bruno Sherman Corp.* (1981), 86 N.J. 361, 431 A. 2d 826, a companion case to *Ramirez, supra,* the court encountered the identical corporate succession as presented to the Michigan court in *Turner v. Bituminous Cas. Co., supra.* The *Nieves* court at 364-365, 431 A. 2d at 828, concluded that Bruno-Sherman, the current successor corporation, was liable for injuries resulting from a defective product placed in the marketplace by the original manufacturer even though an intermediate successor corporation (Harris Intertype, Inc.) continued to exist. Similarly, Cone-Blanchard and Cone II should be liable for injuries occasioned by the product line acquired from Pneumo even though Pneumo continues to exist.

While it is unnecessary to speculate regarding what, if any, liability would be imposed upon Pneumo had not the action against it been time-barred, it is interesting to note that, for purposes of the *Cone* product line, Pneumo is defunct. Pneumo no longer produces the types of products involved in the present litigation, no longer benefits from the good will

generated by the product, and no longer possesses the expertise necessary to improve the quality of the product.

Despite the compelling public policy arguments justifying adherence to the product line theory, the majority insists that adoption of the principles embodied therein requires legislative action. I wish to remind the majority that the instant matter is a case of first impression and that both the "traditional" theory of successor liability and the product line approach are common-law concepts. I, therefore, take issue with the semantical argument advanced in the majority opinion that adoption of the theory it rejects requires legislative action while the theory it adopts does not.

In further support of its rejection of the product line theory, the majority cites "the potentially devastating burden on business transfers" that its adoption would supposedly occasion. However, the rule of law embraced by the majority assures that such burdens will be borne instead by citizens of this state who suffer injuries inflicted by defective products. These individuals are the "unwary" for whose well-being this court should be concerned. Instead, the decisional law announced today enables a business enterprise to benefit from its access to the Ohio market but insulates it from any resulting liabilities. Such an inequitable allocation of burdens and benefits is both unjust and inexcusable.

The injustice resulting from today's holding is further compounded by the rule announced relative to the duty of a manufacturer to warn workers and consumers of the defective condition of its products. In the case at bar, the majority has affirmed the determination of the trial court granting Cone II's and Cone-Blanchard's motions for summary judgment on this issue. The plaintiffs-appellants maintain that Cone-Blanchard had notice of the defect due to reports of similar accidents involving similar machines. Notice of the defective condition of these machines was conveyed to the Cone-Blanchard management at the latest, on March 16, 1979 — the date a summons and complaint was received in a lawsuit filed against the company arising out of an accident occurring in Fort Worth, Texas.

The extent to which Cone-Blanchard was aware or should have been aware of the defects in the machine appears to involve factual questions best resolved by a jury. Moreover, the degree to which past experience with the operation of the machine would alert management to potential defects, the adequacy of the notice and the extent to which there was sufficient time to act upon such notice are examples of issues which require jury consideration. Consequently, it is my opinion that the trial court erred in granting the motions of Cone II and Cone-Blanchard for summary judgment.

For the foregoing reasons, I respectfully dissent from the holding of the majority. I would reverse and remand the matter for trial on the merits.