**KUEMPEL SERVICE, INC., Appellant,**

**v.**

**ZOFKO et al., Appellees.**

[Cite as *Kuempel Serv., Inc. v. Zofko* (1996), 109 Ohio App.3d 591.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–950003.

Decided Feb. 28, 1996.

*Frost & Jacobs, Richard M. Goehler* and *J. Paul Allen,* for appellant.

*Guarnieri & Secrest* and *Michael D. Rossi,* for appellees.

*Per Curiam.*

The plaintiff-appellant, Kuempel Service, Inc. ("Kuempel"), appeals from the judgment of the trial court, following a bench trial, in favor of the defendants-appellees, David E. Zofko, Zofko Construction Company, and Dezco Financial. Kuempel challenges the judgment as both contrary to the law and against the manifest weight of the evidence. Specifically, Kuempel argues that the trial court erred by refusing to hold the defendants-appellees liable for the judgment

Kuempel had previously obtained against Dezcon, Inc., a corporation formerly half-owned by Zofko. For the reasons that follow, we affirm.[1]

## I. THE UNDERLYING JUDGMENT

On or about September 22, 1988, Kuempel, a mechanical service contractor, entered into a subcontract with Dezcon to perform HVAC and plumbing work on a project at Kenwood Towne Centre called "Joe's Burgerama." After performing the work, Kuempel submitted invoices to Dezcon but received no payment. Kuempel thereafter filed suit against Dezcon on April 17, 1990. Dezcon filed an answer. On April 30, 1993, Kuempel received judgment against Dezcon because of the latter's failure to appear and defend the lawsuit. The amount of the judgment against Dezcon was $86,914.35.

Kuempel's attempts to satisfy the judgment were unsuccessful. Ultimately Kuempel obtained information that Dezcon had gone out of business and had no assets from which to satisfy the judgment. Kuempel learned that Randall J. Hake and David E. Zofko, who were each fifty percent shareholders in Dezcon, had separated and that both had formed new construction companies: Randall J. Hake Contracting Company, Zofko Construction Company, and Dezco Financial. Kuempel then filed the current action against Hake and Zofko and their companies on September 13, 1993.[2]

## II. FACTS UNDERLYING THE JUDGMENT

Z & H Development ("Z & H"), Dezcon, and Dezcon Contractors, Inc. ("DCI") were created in 1983 by Hake and Zofko as part of a design and construction business. Dezcon operated as the general contractor. Z & H Development was created for the primary purpose of owning equipment that was leased to Dezcon and occasionally outside companies as well. Z & H owned the real property and structure housing Dezcon. DCI was established for the limited purpose of performing general contracting work involving unions in West Virginia.

Dezcon operated for eight years, building over two hundred fifty shops for The Limited clothing chain and twelve Burger King restaurants. Dezcon kept its own books and maintained a separate corporate checking account. The company advertised in the yellow pages, was a member of trade associations as well a signatory to union contracts, and maintained separate workers' compensation and

---

1. We have *sua sponte* removed this case from the accelerated calendar.

2. Although originally defendants in the action below, Hake and the construction company he began after Dezcon went out of operation, Hake Contracting Company, were both voluntarily dismissed pursuant to a settlement agreement.

unemployment compensation accounts with the state of Ohio. The Dezcon logo was printed on baseball hats, matches, jackets, and other items. The company also sponsored trips to professional sports activities.

Dezcon's client on the Joe's Burgerama project was Fast Food Concepts ("FFC"). FFC suffered financial problems, and consequently Dezcon was paid only about thirty percent of the money it was due for the project. According to Zofko, that money was used to pay Dezcon's bills and its employees. The balance, amounting to approximately $220,000, remained unpaid when the project collapsed and FFC entered bankruptcy. Of that $220,000, approximately $10,000 represented profit to Dezcon and the balance of monies due to others, including Kuempel. Although Dezcon had received personal guarantees from the president of FFC, those guarantees became precarious when the president declared personal bankruptcy after the company went under. Zofko testified that Dezcon did not pursue the matter further because it did not want to expend more money in the courts when they "knew that there was nothing there at the end of the rainbow."

Zofko testified that he understood the contract between Dezcon and Kuempel to require payment only when Dezcon was paid by FFC. Asked why Dezcon did not therefore defend against the original lawsuit filed by Kuempel, Zofko replied that generally Dezcon did defend against such claims, but "[Hake] and I were busy doing other things and that one fell through the cracks." Zofko could not explain why Kuempel had not received any of the monies received by Dezcon for the Joe's Burgerama project.

## III. THE WINDING UP OF DEZCON

By 1989 a difference of business philosophies had developed between Hake and Zofko, and they decided to sever their business ties. To accomplish this, in May 1990 (*i.e.*, after Kuempel had filed its lawsuit against Dezcon), they entered into a written agreement to dissolve Z & H and liquidate Dezcon and DCI. The agreement stated:

"The corporations, unless modified herein, will each wind up affairs in an orderly manner, collect all that is due them, pay all bills, determine and clear all liabilities, file all required tax returns and do all other things necessary to wind up the affairs of each corporation in a manner as best benefits Hake and Zofko."

Although the agreement called for Dezcon to collect all that was due it, Hake testified that this was not, in fact, done. According to Hake, certain "smaller retainages and request for change orders" were not collected, as well as "a lot of things that unfortunately may have fallen through the cracks." Hake testified

that "[a] large portion of what was uncollected" was the monies due for the Joe Burgerama project.

Hake testified that Dezcon negotiated a lot of its bills, and that the money due Kuempel exceeded any of the other outstanding liabilities.

Because it was expected assets of Dezcon would not be sufficient to cover its debts, the wind-up agreement contemplated that either Hake or Zofko would make equal out-of-pocket payments to cover the debts. Dezcon's debts included both those upon which they had issued personal guarantees and strictly corporate debts. Some out-of-pocket payments were made through the corporation, and some were made directly.

As part of the division of assets involved in dissolving Hake and Zofko's business relationship, Hake testified that he chose to take construction equipment while Zofko chose to take real estate assets and computer equipment. The two agreed that the name Dezcon would no longer be used by either so neither could capitalize on the good will associated with the corporation.

## IV. ZOFKO AND ZOFKO CONSTRUCTION

Zofko Construction, Inc. ("ZCI") was created by Zofko following the winding up of his association with Hake. He also created Dezco Financial, Inc. ("DFI") to serve primarily the same role as the former Z & H. ZCI occupied the same building as did Dezcon, had the same telephone number, and employed from forty to fifty percent of the same employees. Zofko testified that ZCI targeted a different market than Dezcon because it was not a design and build specialist. ZCI, however, had some of the same clients as did Dezcon, including The Limited. Zofko testified that, after the breakup of Dezcon, some clients stayed with Hake while others stayed with him due to their difference in personalities. According to Zofko, although ZCI was the low bidder on two or three projects for The Limited, the company's director of construction did not award the bid to ZCI until ZCI had demonstrated its ability to perform.

ZCI, according to the testimony of Zofko, is presently insolvent.

## V. THE ASSIGNMENTS OF ERROR

In support of its two assignments of error, Kuempel raises three arguments why the defendants-appellees should be held responsible for the judgment against Dezcon:

"(1) Exercising domination and control over Dezcon, Zofko acted with Hake to dishonestly or unjustly inflict a loss upon Kuempel, thus requiring that the corporate veil of Dezcon be pierced to impose upon Zofko and his companies liability for the damages proven,

"(2) Uncontroverted evidence established that the corporate assets of Dezcon were distributed to Zofko and Hake prior to the payment of Kuempel, a judgment creditor of Dezcon, thus requiring that the corporate veil be pierced to impose liability upon Zofko and his companies for the judgment, and

"(3) The evidence established that Zofko Construction Company was a successor corporation to Dezcon and therefore liable for its debts."

### A. Piercing the Corporate Veil

Kuempel argues that the trial court applied "outdated and erroneous principles of law" to the concept of piercing the corporate veil by failing to comprehend the liberalizing effect of the Ohio Supreme Court's decision in *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 617 N.E.2d 1075.

In *Belvedere*, the court approved the analysis of the United States Court of Appeals for the Sixth Circuit in *Bucyrus–Erie Co. v. Gen. Products* (C.A.6, 1981), 643 F.2d 413, as striking the "correct balance between the principle of limited shareholder liability and the reality that the corporate fiction is sometimes used by shareholders to protect themselves from liability for their own misdeeds." *Belvedere, supra,* at 289, 617 N.E.2d at 1086. In *Bucyrus–Erie,* the Sixth Circuit, though recognizing that each case was generally regarded as *sui generis,* set forth the following general criteria for disregarding the corporate fiction:

"(1) Domination and control over the corporation by those to be held liable is so complete that the corporation has no separate mind, will, or existence of its own;

"(2) Use of the dominance and control to commit fraud or wrong or any dishonest or unjust act, and

"(3) injury or unjust loss to the plaintiff as a result of such control and wrong." *Id.* at 418.

The court further allowed the jury to consider whether the corporation was adequately financed, *originally or subsequently,*[3] and rejected the argument that a finding of fraud was essential in applying the alter ego doctrine. *Id.*

---

**3.** In his treatise Presser notes that the Sixth Circuit was "[a]pparently unaware" that "[w]hile initial undercapitalization is a commonly applied factor in veil-piercing analysis, there appears to be substantial case law that suggests that a subsequent undercapitalization (in the absence of fraudulent conveyances) ought not to be relevant." Presser, Piercing the Corporate Veil (1995), Section 2.35, 2–353.

Kuempel argues that the corporate identity of Dezcon should be pierced because the corporation was purposefully undercapitalized, subject to the absolute control of Hake and Zofko, and ultimately liquidated in such a manner to benefit Hake and Zofko to the prejudice of Dezcon's creditors. The manner in which Dezcon's assets were distributed upon liquidation necessarily invokes consideration of an ancillary argument raised by Kuempel—that Hake and Zofko violated Ohio's general corporation law by appropriating certain identifiable assets belonging to Dezcon to pay off the debts of Z & H and DCI. According to Kuempel, the assets of Dezcon were to be regarded as a trust fund from which the claims of Dezcon's creditors were to be satisfied before their distribution to Dezcon's shareholders, Hake and Zofko. Thus, Kuempel argues, even if the corporate identity of Dezcon is not pierced, Zofko is personally liable for the proceeds of Dezcon's assets used to pay off non-Dezcon debts.

It is axiomatic that this court does not sit as a trier of fact. Rather, "on the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. In a civil case, "[j]udgments supported by some competent, credible evidence going to all of the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

Notwithstanding the above limitations, scrutiny of the trial court's factual findings reveals a logical inconsistency. The trial court identified Dezcon's primary assets as consisting of (1) the "Florida Condo Proceeds," (2) the accounts receivable, and (3) the "Oaks & Burger $18,000.00 Retainage." The trial court specifically found that none of these assets were "distributed to or otherwise enjoyed by either of its shareholders * * * before paying or adequately providing for payment of all known DEZCON, INC. corporate obligations." In direct contradiction to this, however, the trial court, quoting verbatim the agreement between Hake and Zofko, also found that the Florida condominium proceeds had been applied to pay both " 'proper, appropriate and satisfactory corporate *and partnership debts,*' " and the accounts receivable " 'were exhausted in the payment of DEZCON, INC., and *DEZCON CONTRACTORS, INC.,* debts.' " (Emphasis added.)

Obviously, a finding that the Florida condominium proceeds and Dezcon's accounts receivable were used to pay off noncorporate debts belonging to Z & H and DCI—during a time when Dezcon was still facing suit on a debt by Kuempel—cannot be squared logically with the finding that Dezcon's assets were

not distributed or enjoyed by its shareholders prior to satisfying all of Dezcon's debts.

The inherent conflict in the court's findings requires us to examine the evidence of record to determine whether it supports a finding that the Florida condominium proceeds and Dezcon's accounts receivable actually were used to pay Z & H and DCI debts. We conclude that it does not.

The agreement between Hake and Zofko, upon which the trial court appears to have relied, initially identified the Florida condominium as a Dezcon asset. Inexplicably, the agreement also provided that although the funds for the condominium unit were provided by Dezcon, Hake and Zofko "for all purposes * * * have treated the unit as *partnership property.*" (Emphasis added.) Furthermore, the agreement stated that "Zofko has sold the unit and has net proceeds of Fifty Thousand Five Hundred Dollars * * * [that] have been used to pay proper, appropriate and satisfactory corporate *or partnership debts.*" (Emphasis added.)

It is unclear whether the agreement's use of the word "or" in the phrase "corporate or partnership debts" is used in the conjunctive or disjunctive. It is ambiguous, therefore, whether, under the terms of the agreement, the Florida proceeds actually went to pay off Dezcon's debts, Z & H's debts, or both. Compounding this ambiguity is the fact that the agreement, either by design or by poor draftsmanship, refers to the Florida condominium proceeds as both a Dezcon asset and "partnership property."

The evidence produced at trial does not shed any greater light upon the ultimate disposition of the Florida condominium proceeds. Asked whether either he, his corporation, or Zofko or his corporations enjoyed any of these proceeds, Hake responded: "I'm not aware of that." Hake testified only that he "didn't get any of it" and that he understood that the proceeds "went to pay some insurance bills * * * [a]nd maybe a couple of other bills." Although he identified those bills as belonging to "creditors," he was not asked by either side whether the bills were for Dezcon debts or Z & H partnership debts.

Zofko was only asked if any of the corporations "with which you're now associated [*i.e.,* ZCI or DFI] purchase[d] or otherwise enjoy[ed] one penny" of the Florida condominium proceeds, to which he responded, "No, we did not." Zofko, like Hake, was never asked whether the Florida condominium proceeds had been applied to Z & H partnership debts as opposed to Dezcon debts.

Although the trial court cited page 10 of the agreement in its finding of fact with respect to the accounts receivable, the agreement on that page does not identify any assets as such. Instead, under Section 12, entitled "Corporate Funds," the agreement provides:

"Hake and Zofko agree to activate the Dezcon field account checking account No. 1613295501 maintained at the Second National Bank for the purpose of collecting all funds due to Dezcon and DCI and paying all debts of the said corporations. This corporate checking account will require the signatures of *both* Hake and Zofko on all checks written on the account and on any other withdrawal transactions on the account. *All Dezcon and DCI funds shall be deposited in this corporate checking account. All Dezcon and DCI debts will be paid through this account.*" (Emphasis added.)

The testimony with respect to Hake and Zofko's understanding of this paragraph is vague and confusing. Zofko did testify that he did not withhold any funds of Dezcon from paying creditors. He stated that he did not remember whether he was personally aware of Kuempel being a potential creditor of Dezcon by virtue of the lawsuit filed against it prior to the execution of the Agreement. He did state, however, that Dezcon, as a corporation, "appeared" to have been aware of Kuempel's action. He stated that "[w]e had legal counsel that defended our contracts before and felt comfortable that they could defend Kuempel's position against Dezcon." He stressed again that he did not know why Dezcon did not thereafter defend against the lawsuit.

At the close of the evidence, a colloquy occurred between the trial court and counsel for Kuempel. As part of that colloquy, counsel for Kuempel asserted that its evidence showed that Hake and Zofko had violated the "commercial general corporation law" requiring that any assets of a corporation in dissolution be used to pay creditors before being enjoyed by the shareholders. The court's response is informative:

"THE COURT: But you haven't shown me that one dime was divided between the shareholders. How much was divided? When was it divided? I don't know. I have to guess.

"MR. ALLEN: At a minimum, Your Honor, we should be given the opportunity to inquire and find out through a judgment that we are entitled to search for any Dezcon assets which made their way into the hands of the shareholders.

"THE COURT: You have a judgment here, you could have had a judgment debtor examination. You could have traced this through. You could have thrown DEZCON into bankruptcy. You can still do it today. You could have done all of these things. But you're coming here and you're asking me—I agree with your law, your [b]ook law is good law. But the facts are missing here. I don't have any facts."

Based on the foregoing, we hold that the evidence regarding the ultimate disposition of Dezcon's assets, specifically the accounts receivable and the Florida

condominium proceeds, is insufficient to establish that they were misappropriated by Hake or Zofko or otherwise used to pay debts not belonging to Dezcon. Consequently, we find no error in the trial court's resolution of the evidence and legal issues with respect to piercing the corporate veil under the *Belvedere/Bucyrus–Erie* standard. Specifically, we agree with the trial court that Kuempel failed to satisfy its burden of demonstrating that Dezcon lacked a corporate will of its own or that Hake and Zofko manipulated Dezcon's corporate identity in such a wrong or unjust manner to justify piercing the corporate veil. Although Kuempel argues that Dezcon was undercapitalized, its evidence consists primarily of the fact that there were not sufficient assets, upon the dissolution of the company, to satisfy the judgment it later obtained. This fact alone, however, does not demonstrate that the corporation was undercapitalized during its existence. Nor does the fact that Dezcon's assets were largely its accounts receivable establish that Dezcon was undercapitalized absent evidence that those accounts, if fully paid, were not sufficient to meet its expenses.

Furthermore, Kuempel's assertion that Hake and Zofko's ownership of Dezcon was "exploited to gather the assets of Dezcon and the other two business entities for payment of personal guarantees and distribution of the two shareholders without regard to payment of Dezcon's creditors" was rejected by the trial court in its findings of fact and, given our discussion of this issue, we cannot say that the trial court lost its way or created a miscarriage of justice. The evidence with respect to Hake and Zofko's use of the fund established under Section 12 of the agreement fails to establish that Dezcon funds were used to pay personally guaranteed Dezcon debts before other Dezcon debts having priority.

### B. Successor Liability

While acknowledging the general rule of successor corporation liability that a new corporation is not liable for the debts of the prior corporation, see *Ohio Bur. of Workers' Comp. v. Widenmeyer Elec. Co.* (1991), 72 Ohio App.3d 100, 593 N.E.2d 468, Kuempel nonetheless argues that this case meets the requirements of the "mere continuation" exception. According to Kuempel, ZCI is a mere continuation of Dezcon based upon all of the following:

(1) The assets of Dezcon were shifted from Dezcon to ZCI.

(2) ZCI, as well as the company later established by Hake, "co-opted the exact same shareholders, directors and officers, Hake and Zofko, as had previously been in place with Dezcon."

(3) A large number of Dezcon's former employees went to work for ZCI.

(4) ZCI maintained the exact same location and business address as Dezcon, as well as the same telephone number.

(5) ZCI remained in the general contracting and engineering business, "the same type of business as Dezcon."

■ We begin our analysis by noting that Kuempel's successor-liability claim sounds in contract since that was the source of the original judgment. In *Welco Industries, Inc. v. Applied Cos.* (1993), 67 Ohio St.3d 344, 349, 617 N.E.2d 1129, 1133, the Ohio Supreme Court held that "a corporation that purchases the assets of another corporation is not liable for the contractual liabilities of its predecessor corporation unless (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." As Kuempel's argument is limited to the third exception, we will similarly limit our analysis to its particular applicability.

■ In *Welco,* the court emphasized that the basis of the traditional mere-continuation exception "is the continuation of the corporate entity, not the business operation, after the transaction." *Id.,* 67 Ohio St.3d at 350, 617 N.E.2d at 1134; see, also, *Flaugher v. Cone Automatic Machine Co.* (1987), 30 Ohio St.3d 60, 30 OBR 165, 507 N.E.2d 331. The key inquiry is whether the successor corporation is merely a reincarnation of its predecessor, the old corporation in a new hat. *Id.*

■ Significantly, the court in *Welco* expressly rejected, as it had in *Flaugher, supra,* what it referred to as "the expanded mere-continuation theory" which allows for a finding of successor liability even in a cash-for-assets transaction provided there are significant shared features between the predecessor and the successor corporations. According to the court in *Welco,* indicia of mere continuation consisting of both the predecessor and successor corporations having the same physical plant, officers, employees and product line are "relevant only to the *expanded* mere-continuation" theory of liability. (Emphasis *sic.*) *Welco,* 67 Ohio St.3d at 350, 617 N.E.2d at 1134.

■ The case *sub judice* does not present a typical cash-for-assets purchase, or a stock transfer, or a sale of assets for stock. Although Kuempel claims that the assets of Dezcon were shifted to ZCI, Dezcon's assets were, as we have seen, primarily monies due it, and the evidence fails to establish that any of Dezcon's monetary assets ended up in the corporate hands of ZCI. With respect to any physical assets transferring from Dezcon through Zofko to ZCI, the trial court

specifically found that these were of *de minimis* value consisting of office furniture and computer equipment, the ownership of which was disputed.

In order to make the argument that ZCI "co-opted the exact same shareholders, directors, and officers, Hake and Zofko," as had previously been in place with Dezcon, Kuempel asks that both Zofko *and Hake's* subsequent corporate enterprises be "considered jointly for purposes of this analysis." We find no precedent, however, for treating two separately owned, separately operating successor corporations as one for the purposes of establishing indicia of mere continuation. Considered independently, ZCI clearly did not have the same shareholders, directors, and officers as did Dezcon because of the breakup of the business relationship between Hake and Zofko.

Moreover, the indicia of mere continuation asserted by Kuempel, including ZCI having the same physical plant, telephone number and some of the same employees as Dezcon, are, according to the court in *Welco,* "relevant only to the *expanded* mere-continuation" theory of successor liability, not the traditional theory recognized in Ohio.

As noted, the real inquiry is whether ZCI is Dezcon reincarnated, in other words a reorganization of Dezcon executed to escape Dezcon's liabilities. The trial court concluded that it was not. Because ZCI had its own ownership and its own assets, targeted a different market, and was considered to exist on its own merits as a bidder on projects, we find no basis to overturn the trial court's conclusion.

Accordingly, Kuempel's two assignments of error are overruled and the judgment of the trial court affirmed.

*Judgment affirmed.*

GORMAN, P.J., HILDEBRANDT and SUNDERMANN, JJ., concur.