HARRIS, Dir., et al., Appellants,

v.

CITY OF CINCINNATI et al., Appellees.

[Cite as *Harris v. Cincinnati* (1992), 79 Ohio App.3d 163.]

Court of Appeals of Ohio,
Hamilton County.

No. C–900607.

Decided April 1, 1992.

*Lee Fisher*, Attorney General, and *Dan E. Belville*, Assistant Attorney General, for appellants James W. Harris, Director, Ohio Department of Industrial Relations, and Ohio Department of Industrial Relations.

*Fay D. DuPuis*, Acting City Solicitor, and *James F. McCarthy III*, for appellees city of Cincinnati and Scott Johnson, City Manager, city of Cincinnati.

*Thompson, Hine & Flory, Jack F. Fuchs* and *Stacey L. Murphy*, for appellee Tower Place Limited Partnership.

-----

UTZ, Judge.

The Ohio Department of Industrial Relations (the "department") and its director filed a complaint for injunctive relief and for a declaratory judgment against the city of Cincinnati, Tower Place Limited Partnership (the "partnership") and Turner Construction Company. Following the presentation of the department's evidence at a hearing, the trial court directed a verdict in favor of the defendants and against the department. The department then filed this appeal. For the reasons which follow, the judgment of the trial court is reversed, and this cause is remanded for further proceedings.

The facts as stipulated by the parties indicate the following. In 1962, the city adopted the Central Business District Core Urban Renewal Plan. The plan provided for the clearance, reconstruction and rehabilitation of slum, blighted and deteriorating areas within the core area of the central business district. That area included the tract of land bounded by Fourth Street on the south, Race Street on the West, and the Netherland Plaza on the north, known as the "Fourth and Race site."

On August 4, 1988, the partnership purchased the fee to the property located at the Fourth and Race site from May Centers, Inc. May Centers, Inc. executed a limited (special) warranty deed to the partnership for that property. The partnership also purchased a 52.9 percent interest in the fee and a 100 percent interest in a long-term lease of a parking garage connected by a skywalk to the property at the Fourth and Race site.

On August 11, 1988, the city and the partnership entered into a "Contract for Sale and Lease of Land for Private Redevelopment," which involved the property located at the Fourth and Race site. Under the terms of that contract, the city agreed to purchase all of the partnership's right, title and interest in the property for $6.5 million less the city's actual site-preparation costs.

Pursuant to the contract entered into with the partnership, the city agreed to complete the site-preparation work on the property, including the removal of asbestos, the disconnection or sealing of sewers and utility lines, the demolition of buildings and other structures on the property, the removal of debris, the repair of any damage to adjacent structures caused by the demolition, and the preparation of the site for delivery to the partnership for the commencement of construction. The partnership agreed to develop the property in accordance with the city's Central Business District Core Urban Renewal Plan. The partnership further agreed to construct certain improvements on the property after obtaining the city's approval on the schematic plans, preliminary plans and construction plans. The improvements included a three-level retail specialty shopping mall; a five-level public parking garage; an enclosed, elevated pedestrian bridge; sidewalks, curbs and other external improvements; a double-level vehicular bridge; and continuous covered second-level pedestrian walkways through the improvements.

In accordance with the Contract for Sale and Lease of Land for Private Redevelopment, the partnership executed a limited (special) warranty deed to the city. The city then became the fee owner of the property at the Fourth and Race site.

Subsequently, the city and the partnership decided to have the site-preparation work done by the partnership rather than by the city as provided in their contract for redevelopment. The city and the partnership entered into a "Site Preparation Work Agreement" to provide for this alteration of the original contract. The partnership agreed to perform the site-preparation work to achieve "cost efficiencies" for the city and to "ensure proper coordination" between the site-preparation work and the construction of the improvements on the property.

The partnership then entered into a contract with Turner Construction Company ("Turner"). Under that contract, Turner agreed to demolish the old buildings and construct certain improvements at the Fourth and Race site.

On October 30, 1989, Turner completed the site-preparation work at a cost of $1,354,990, which the city paid to the partnership. The city paid an additional $5,105,285 to the partnership for the right, title and fee-simple interest in the property located at the Fourth and Race site. The city then leased the property back to the partnership for construction of the Tower Place Project.

By letters dated July 3, 1989 and July 5, 1989, the department informed the city and the partnership that the department had determined that Ohio's prevailing-wage law applied to the Tower Place Project. The city and the

partnership replied that the prevailing-wage law did not apply to this project. The city then passed Resolution R/85–1989, which provided as follows:

"That, in order to ensure the prompt commencement and completion of the Tower Place Project, the City and the developer [the partnership] will share equally the risk of increased project costs attributable to the court rulings on the prevailing wage issue, provided that under no circumstances would the City's contribution be in excess of $1,000,000.00."

The department filed a complaint against the city, the partnership and Turner which alleged violations of Ohio's prevailing-wage law and which sought the following relief:

"(1) a preliminary injunction and a permanent injunction prohibiting the defendants from authorizing any further work on the Tower Place Project;

"(2) a preliminary injunction and a permanent injunction prohibiting the defendants from entering into any future contracts for construction work on the Tower Place Project;

"(3) a declaration that the city is liable for back wages, fines, damages, court costs and attorney fees; and

"(4) costs."

The department also filed a motion for a temporary restraining order and a motion for a preliminary injunction.

The trial court denied the department's motion for a temporary restraining order and set a hearing date for the department's motion for a preliminary injunction. By agreement of the parties, that hearing was merged with the hearing on the department's request for a permanent injunction.

At the hearing, the parties presented the trial court with a set of stipulated facts, and the department presented its evidence. The defendants then moved for an involuntary dismissal under Civ.R. 41(B)(2). The trial court treated the defendants' motion as a motion for a directed verdict under Civ.R. 50(A). Construing the evidence most strongly in favor of the department, the trial court held that reasonable minds could come to but one conclusion based upon the department's evidence, that conclusion being that Ohio's prevailing-wage law did not apply to the Tower Place Project. The trial court, therefore, directed a verdict against the department in favor of the defendants. This appeal by the department followed.

On appeal, the department raises four assignments of error as follows:

"1. The trial court erred to the prejudice of plaintiffs-appellants in granting defendants-appellees a directed verdict at the close of plaintiffs-appellants' case.

"2. The trial court erred to the prejudice of plaintiffs-appellants in denying plaintiffs-appellants' motion for preliminary and permanent injunction.

"3. The trial court erred to the prejudice of plaintiffs-appellants in declaring that the Tower Place Project is not a 'public improvement' subject to Ohio's prevailing wage law, R.C. 4115.03 *et seq.*

"4. The trial court erred to the prejudice of plaintiffs-appellants in declaring that the provisions of Ohio's prevailing wage law are penal in nature and must be strictly construed."

Initially, we note that the trial court incorrectly utilized the standard provided in Civ.R. 50(A)(4) in ruling on the defendants' motion for an involuntary dismissal. The motion by the defendants should have been determined pursuant to the provisions of Civ.R. 41(B)(2), which is governed by a different standard. See *McIntyre v. N. Ohio Properties* (1979), 64 Ohio App.2d 179, 18 O.O.3d 139, 412 N.E.2d 434.

Civ.R. 41(B)(2) provides:

"After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52 if requested to do so by any party."

The court on a motion for involuntary dismissal "is not required to review the evidence in the light most favorable to the plaintiff but is required only to determine whether the plaintiff has made out his case by a preponderance of the evidence." *Jacobs v. Bd. of Cty. Commrs.* (1971), 27 Ohio App.2d 63, 65, 56 O.O.2d 245, 246, 272 N.E.2d 635, 636.

Applying the correct standard, we hold that the trial court erred in "dismissing" the department's case as the department had satisfied its burden of proof. We, therefore, reverse the judgment of the trial court and remand the case to the trial court for further proceedings.

When applicable, Ohio's prevailing-wage law, as contained in R.C. 4115.03 to 4115.16, requires an employer to pay its workers a minimum hourly rate to be determined by the Ohio Department of Industrial Relations. R.C. 4115.04. " '[T]he primary purpose of the prevailing wage law is to support the integrity of the collective bargaining process by preventing the undercutting of employ-

ee wages in the private sector.' " *Harris v. Van Hoose* (1990), 49 Ohio St.3d 24, 26, 550 N.E.2d 461, 463.

The prevailing-wage law in Ohio applies to all construction projects that are "public improvements." R.C. 4115.10(A). As provided in R.C. 4115.03(C), the term " 'public improvement' includes all buildings, roads, streets, alleys, sewers, ditches, sewage disposal plants, water works, and all other structures or works constructed by a public authority of the state or any political subdivision thereof or by any person who, pursuant to a contract with a public authority, constructs any structure for a public authority of the state or a political subdivision thereof."

The department contends that the prevailing-wage law applies to the Tower Place Project because it is a project constructed "pursuant to a contract with a public authority" and "for a public authority." We must first determine whether, based upon the department's evidence, the contract for sale and lease of the property at the Fourth and Race site between the partnership and the city could constitute a contract with a public authority.

R.C. 4115.03(A) defines a "public authority" as "any officer, board, or commission of the state, or any political subdivision of the state, authorized to enter into a contract for the construction of a public improvement or to construct the same by the direct employment of labor, or any institution supported in whole or in part by public funds and said sections [R.C. 4115.03 to 4115.16] apply to expenditures of such institutions made in whole or in part from public funds." The city falls within this definition and is, therefore, a public authority for purposes of the prevailing-wage statutes.

Next, the construction must be done "pursuant to" a contract with the city to be subject to the prevailing-wage law. R.C. 4115.03(C). The contract entered into by the city and the partnership entitled "Contract for Sale and Lease of Land for Private Redevelopment" provided for the sale and lease of the property located at the Fourth and Race site. The contract further provided that upon leasing the property the partnership was to complete certain enumerated improvements on the property including a retail shopping mall, public parking garage and pedestrian walkways. According to the contract, the construction to be completed by the partnership was authorized by the city to further its Central Business District Core Urban Renewal Plan. Finally, the contract provided for the city's approval of the partnership's schematic plans, preliminary plans and construction plans for the improvements to the property.

The contract entered into by the city and the partnership specifically provided for the development of the Tower Place Project. Although the

partnership negotiated specific work details regarding the improvements with Turner, the city remained involved in the planning and approval of the construction plans. Thus, based upon the department's evidence, the partnership constructed the improvements at the Fourth and Race site "pursuant to a contract with a public authority." But, see, *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 61 Ohio St.3d 366, 575 N.E.2d 134 (construction not pursuant to a contract with a public authority where the contract did not set forth the plans for-the construction and where the county had no involvement in the planning of the construction).[1]

Finally, the Tower Place Project must be constructed "for a public authority" in order for the prevailing-wage statutes to apply. R.C. 4115.03(C). In order for the project to be considered "for a public authority," the public authority, rather than the general public, must benefit from the construction. *Episcopal Retirement Homes, Inc., supra.* In fact, it is inappropriate to categorize all projects which benefit the public as being "for a public authority" pursuant to R.C. 4115.03(C). *Harris v. Bi Mi Jo, Inc.* (Apr. 24, 1991), Medina App. No. 1942, unreported, 1991 WL 65104.

To determine whether the public authority received the benefit of the construction, we must look at whether the public authority either maintained a possessory or property interest in the completed project, or used public funds in the construction of the project. *Episcopal Retirement Homes, Inc., supra.* Absent a showing that the public authority maintains an ownership · or possessory interest in the property, or that public funds are being made available by the public authority to underwrite the costs of construction, the presence of a benefit to the public authority, standing alone, is not sufficient to conclude that the construction is "for a public authority." 1987 Ohio Atty. Gen. Ops. No. 87–007.

Pursuant to the Contract for Sale and Lease of Land for Private Redevelopment, the partnership executed a limited (special) warranty deed to the city for the property located at the Fourth and Race site. Because there is no evidence in the record to indicate that the city transferred that deed, the city clearly maintained a possessory interest in the Tower Place Project as the fee owner of the property.

---

1. The Supreme Court of Ohio first decided this case on August 14, 1991. On October 8, 1991, the Supreme Court *sua sponte* ordered a rehearing of the case. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 62 Ohio St.3d 1427, 578 N.E.2d 819. Since no party sought a rehearing and no new evidence or argument was presented, the Supreme Court, on December 6, 1991, vacated the order granting a rehearing. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 62 Ohio St.3d 1214, 582 N.E.2d 606.

In addition, based upon the evidence in the record, the city made available public funds to finance the construction of the Tower Place Project. In August 1988, the city authorized the transfer of money from several existing accounts into a separate account identified as the Tower Place Acquisition and Improvements Fund. Subsequently, the city paid to the partnership $6.5 million, less the cost for site-preparation work, to purchase the property upon which the Tower Place Project was to be built. The city immediately leased the property back to the partnership. Although there is no direct evidence that the funds paid by the city to purchase the property at the Fourth and Race site were used by the partnership to finance the construction costs in the development of the Tower Place Project, we believe it is an appropriate inference to be made based upon the facts of this case.

Finally, based upon the department's evidence, the city "benefits" from the construction of the Tower Place Project. The Tower Place Project furthers the city's objectives in its Urban Renewal Plan of reconstructing and rehabilitating the slum, blighted and deteriorating areas of the city. In accordance with the city's plan to revitalize the downtown area, the Tower Place Project will improve the appearance of the city and attract businesses to the area. In addition, the retail shopping mall will encourage people to shop and spend money in the downtown area. The improvement to the city in the form of the Tower Place Project will, therefore, yield a "benefit" to the public authority.

The evidence submitted by the department indicates that the city retained a possessory interest in the Tower Place Project, provided public funds to finance the construction, and expected to benefit from the improvements. The Tower Place Project was, therefore, constructed "for a public authority."

■ Based upon the evidence presented by the department at the hearing on the merits, it is apparent that the Tower Place Project constituted a "public improvement" because it was constructed pursuant to a contract with a public authority for a public authority. See R.C. 4115.03(C). The department, therefore, met its burden at the hearing to establish that the construction on the Tower Place Project was subject to the prevailing-wage statutes. See Civ.R. 41(B)(2). Accordingly, the trial court erred in "dismissing" the department's case against the defendants. Thus, the department's first assignment of error is sustained.

Because the trial court erred in "dismissing" the department's case at the close of its presentation of the evidence, this cause is remanded to the trial court for the presentation of the defendants' evidence. Due to the absence of the defendants' case, we cannot determine whether the trial court erred in denying the department's request for injunctive relief or in declaring the Tower Place Project exempt from Ohio's prevailing-wage law. We, therefore,

cannot address the merits of the specific issues raised in the department's second, third and fourth assignments of error. However, these assignments of error are sustained solely on the basis of our disposition of the first assignment of error.

The judgment of the trial court is reversed, and this cause is remanded to the trial court for further proceedings in accordance with the law.

*Judgment reversed*
*and cause remanded.*

SHANNON, J., concurs.

GORMAN, P.J., concurs in part and dissents in part.

GORMAN, Presiding Judge, concurring in part and dissenting in part.

I concur with the judgment of the majority, but disagree with the majority's remand of the case to the trial court for further proceedings. I do so because there is no question, at least in my mind, that the trial court has in fact determined this case on its merits and nothing further remains for determination by the trial court.

The prevailing-wage law, set forth in R.C. 4115.03(C), applies to the Tower Place Project because it was constructed pursuant to a contract with a public authority. However, there is an even more basic reason. It is undisputed that the site preparation for the project was bid subject to the prevailing-wage law, but the balance of the project was not. The project cannot be both. When the parties acknowledged that the prevailing-wage law applied to the site-preparation work, the entire project was then subject to the prevailing-wage law.

The prevailing-wage law dates back to the Depression and was enacted to check the influx of cheap out-of-state labor and to establish a fair rate of wages on public projects for the construction trades. In *State ex rel. Evans v. Moore* (1982), 69 Ohio St.2d 88, 91, 23 O.O.3d 145, 147, 431 N.E.2d 311, 313, the Supreme Court said:

"Above all else, the primary purpose of the prevailing wage law is to support the integrity of the collective bargaining process by preventing the undercutting of employee wages in the private construction sector."

In *Phung v. Waste Management, Inc.* (1986), 23 Ohio St.3d 100, 103, 23 OBR 260, 262, 491 N.E.2d 1114, 1117, the Supreme Court observed:

"Furthermore, the Ohio Constitution delegates to the legislature the primary responsibility for protecting the welfare of employees. Sections 34 and 35 of Article II authorize the General Assembly to adopt laws regulating

minimum wages, health and safety and hours of labor and to provide a plan for workers' compensation. In the past, this court has deferred employment matters to the legislature. *State, ex rel. Clark, v. Brown* (1965), 1 Ohio St.2d 121 [30 O.O.2d 478, 205 N.E.2d 377]."

In view of the legislature's clear expression of intent contained in the prevailing-wage law, courts have a duty to enforce the law even in those situations where the parties resort to a strawman or various lease-back devices. To do otherwise is to frustrate the policy of the General Assembly. It is the obligation of this court to carry out the policy dictates of the General Assembly. We should not permit parties to do through the back door what they cannot do through the front door. In this case the city not only held the title to the land, but it paid almost $6.5 million to the developer.

These policy considerations are valid and in line with *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations, supra.* There, the Supreme Court, in a four-to-three decision, held that hospital bonds were not public improvements because of the mechanism of R.C. Chapter 140 under which the legislature expressly granted public and non-profit hospital agencies authority to construct and upgrade facilities with tax-exempt obligations. Therefore, according to the *Episcopal Homes* majority, R.C. Chapter 140 hospital bonds are a separate legislative category for purposes of the prevailing-wage law.[2]

After determining that the criteria of R.C. 4115.03(C) were met under the facts, the majority is now remanding this case to the trial court to relitigate this issue for the reason that the trial court entered judgment under Civ.R. 41(B). Because the parties agreed to present the issue of the application of the prevailing-wage law solely upon stipulated facts and documents, the trial court's judgment was necessarily conclusive as to both the injunction and the declaratory judgment, or the order would not have been appealable. See *Gen. Acc. Ins. v. Ins. Co. of N. Am.* (1989), 44 Ohio St.3d 17, 540 N.E.2d 266. As a result of the majority's findings on the merits this case should be remanded under App.R. 12(B) with instructions to the trial court to enter the judgment it should have entered, as a matter of law, and to order that the prevailing-wage law applies to the Tower Place Project.

---

2. In the court's decision to vacate the rehearing order in *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 62 Ohio St.3d 1214, 1218–1221, 582 N.E.2d 606, 608–611, Justice Resnick's dissent and Justice H. Brown's concurrence may signal that the minority is now the majority, but the court did not address the issue again because of procedural grounds.