PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant,

v.

SCIENCE PARK LIMITED PARTNERSHIP et al., Appellees.

[Cite as *Prudential Ins. Co. of Am. v. Science Park, L.P.* (1995), 106 Ohio App.3d 823.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 68192.

Decided Oct. 16, 1995.

824

*Graydon, Head & Ritchey, Stephen L. Black, John L. Evans* and *Deborah S. Poley,* for appellant.

*Ulmer & Berne, Marvin L. Karp, Martin W. Elson* and *Stuart A. Laven,* for appellees.

*Richard G. Zeiger, Thompson, Hine & Flory* and *Alan R. Lepene,* for appellee Society National Bank.

---

PATRICIA ANN BLACKMON, Judge.

Plaintiff-appellant Prudential Insurance Company of America appeals the trial court's granting summary judgment in favor of the defendants-appellees Science Park Limited Partnership, WWM Science Park Limited Partnership, William Weber, Gerald Medinger, and Society National Bank. Prudential assigns the following three errors for our review:

"I. The trial court erred in granting the motion for summary judgment of appellees Science Park Limited Partnership, WWM Science Park Limited Partnership, William M. Weber, and Gerald B. Medinger in that the facts show Weber and Medinger are liable for directing the partnership to make payments to or for the benefit of the individual partners, after default on the mortgage loan of Prudential, which were made in breach of the terms of the Prudential loan documents and in breach of the express trust created by the terms of an assignment of leases and rents (the 'assignment') when the partnership was insolvent at the time the payments were made and those payments violated Ohio Rev.Code § 1336.05(B) and § 1313.56.

"II. The trial court erred in granting the motion for summary judgment of appellee Society National Bank in that the facts show certain payments were made to Ameritrust Company, N.A., Society's predecessor, at a time the partnership was insolvent and those payments violate Ohio Rev.Code § 1336.05(B) and § 1313.56 and Society was the direct recipient of funds transferred in a fraudulent manner.

"III. The trial court erred in denying the motion for summary judgment of appellant Prudential Insurance Company of America and dismissing its second amended complaint in that the facts show that appellees Weber and Medinger are personally liable to Prudential for the post-default payments made by the partnership to Ameritrust and Messrs. Weber, Wood, Medinger, and Society are liable for the payments received as fraudulent transferees."

After reviewing the record and the arguments of the parties, we affirm in part and reverse in part the trial court's decision. The apposite facts follow.

William Weber, Gerald Medinger, and Alan Wood[1] were general partners of WWM Science Park Limited Partnership ("WWM Science Park"). WWM Science Park was the general partner of Science Park Limited Partnership ("Science Park"). Science Park on October 26, 1988 borrowed $9,500,000 from the Prudential Insurance Company of America ("Prudential") for the construction of an office building. The office building rents were to be used to repay the loan to Prudential. Consequently, Prudential and Science Park executed a Promissory Note, an Open–End Mortgage and Security Agreement, and an Assignment of Leases and Rents.

Section 8.01(a) of the mortgage agreement provided that neither Science Park nor its general partner, WWM Science Park, or the partners of WWM Science Park "shall be liable for any deficiency judgment with respect to any Obligation secured by this Instrument." Section 8.01(b) provided that Section 8.01(a) would not relieve Science Park, WWM Science Park or its partners of personal liability or responsibility "for any rents or other income from the Premises received by or for [Prudential] after a default hereunder or under any other Loan Document and not applied to the fixed and operating expenses of the Premises."

Science Park began experiencing financial difficulties in 1989. Weber, Medinger, and Wood, as individuals, each borrowed $235,000 from Ameritrust Bank, now Society National Bank ("Society"). The loan money, totalling $705,000, was subsequently loaned to Science Park by the three individuals. In February 1990, Science Park began repaying Society in monthly installments of $9,720.

Science Park's financial difficulties continued, and it defaulted on its note to Prudential in March 1992. Nevertheless, it continued to pay the loan to Society. At times, it accelerated its payments to Society and paid the loans earlier than the payment schedule required. Several of the payments were made directly to Society and several of them were made to Weber, Wood, and Medinger.

In October 1992, Prudential filed a foreclosure action against Science Park. Prudential also filed suit on June 8, 1993 against Science Park, WWM Science Park, Weber, Medinger, Wood and Society. Prudential's complaint alleged that the payments made on the partner loans after May 1992 were fraudulent transfers in violation of R.C. 1336.04, 1336.05, and 1313.56. Prudential also sought restitution from Society, alleging that Society was unjustly enriched by accepting the payments.

---

1. Science Park's claims against Wood were later dropped after he filed bankruptcy.

On October 12, 1993, Prudential amended its complaint to include allegations that the defendants conspired to divert rent payments from the promissory note and pay down their obligation to Society with rent funds earmarked for Prudential. Prudential also alleged that all defendants except Society were insolvent and may be "insiders" as defined by R.C. 1336.01(G).

In its second amended complaint filed May 5, 1994, Prudential alleged that the postdefault payments were fraudulent and preferential transfers. Prudential also alleged that Science Park's postdefault payments (totalling $623,136.94) constituted a breach of trust and breach of the terms of the loan agreements, and Society is liable for the payments because Society had actual or constructive knowledge of such breach.

On May 19, 1994, after a hearing, the trial court found that the postdefault payments on the partner loans were not "fixed and operating expenses" as the term is used in the mortgage agreement. Thereafter, each party filed for summary judgment. On October 31, 1994, the court dismissed the second amended complaint, granted summary judgment in favor of the defendants and denied Prudential's motion for summary judgment. The court made the following findings:

"The Court finds that the subject payments were made in payment of legitimate Partnership obligations in the ordinary course, and as a necessary part of the Partnership's business, and that plaintiff has failed to establish that there is a genuine issue of fact as to the Partnership being insolvent within the meaning of Ohio R.C. § 1336.02 and 1313.56. The Court further finds that the plaintiff's loan documents did not prohibit the Partnership from making such payments, either before or after default, even though they were for other than fixed and operating expenses; that the exceptions to the limited recourse provisions contained in the plaintiff's loan documents are not applicable to such payments; and that such payments did not constitute a breach of the loan documents or a breach of trust."

■ The first issue for our review is whether the language of the loan documents imposed personal liability upon Weber and Medinger for the postdefault payments made to Society. Section 8.01(a) provides that the parties are relieved from liability except as in (b), which says the parties are personally liable and responsible for any rents or other income from the premises received by Science Park after a default when the rents or other income from the premises are not applied to the fixed and operating expenses of the premises. Under this section, rents or other monies collected after default must be paid to Prudential unless they are used for fixed and operating expenses. The trial court found, and we agree, that the payments to Society were not fixed and operating expenses of the premises. Consequently, the question for us is whether Prudential as the nonmovant has sufficiently produced evidence to show that the payments to

Society were rents and other income from the premises. If so, a question of fact exists as to liability.

Prudential argues that such liability arose when Science Park breached the Assignment of Leases and Rents signed by the parties. According to the language of the assignment, Prudential had the right to the rents collected from the office building. The assignment provided that Science Park had a license to collect the rents, income, and profits from the building's leases "so long as there is no default or breach" by Science Park under any of the Obligations, the Promissory Note, the Open–End Mortgage and Security Agreement, the Assignment of Leases and Rents, or any other loan document. Science Park agreed to "hold any and all such Rents in trust" and to "apply the same in payment of the Obligations." The assignment also provided that "if [Science Park] defaults on the Obligations, the Security Instrument or this Assignment, and until such default shall have been fully cured, the License of Assignor to collect rents, income and profits shall cease and terminate."

We find that these agreements, taken together and as applied to the undisputed facts of this case, raise a genuine issue of fact about whether the partners were individually liable on the mortgage instrument. Under the assignment, Prudential had a right to all rental and other income generated by the office building. Science Park's license to collect the rents terminated when Science Park defaulted on the mortgage. Once Science Park's license to collect rents terminated, Science Park had no right to collect the rents and, under the assignment, all right, title, and interest in the rents belonged to Prudential, and Science Park became liable to Prudential for the rents.

If the rents were used to pay debts other than "fixed or operating expenses," the partners were not protected from personal liability as provided in Section 8.01(b). Because the mortgage agreement specified that the nonrecourse clause did not apply to "rents or other income from the premises received by or for Debtor after a default," we find that a genuine issue of fact exists for trial as to whether Science Park's payments to Society constituted a breach of the assignment and subjected the partners to personal liability.

■ The next issue raised by this appeal is whether the postdefault payments to Society constituted fraudulent transfers under R.C. 1336.05(B). R.C. 1336.05(B) provides:

"A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the transfer was made to or the obligation was incurred with respect to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."

■ Because the challenged conveyances in this case were payments of money, they were "transfers" as defined in R.C. 1336.01(L). In order to prevail on its fraudulent transfer claim, Prudential had to show that it had a claim against Science Park at the time the payments were made. Science Park's default on the mortgage, which arguably gave rise to Prudential's claim, occurred in 1992. The payments alleged to be fraudulent were all made after the date of the default. Consequently, Prudential's claim arose before the transfers were made.

However, the parties argue different interpretations of the following language in R.C. 1336.05(B): "if the transfer was made to or the obligation was incurred with respect to an insider." Prudential alleges that the postdefault payments on the partner loans were transfers made *with respect to* insiders. According to Prudential, Weber and Medinger, as general partners of WWM Science Park, are insiders of Science Park. Science Park argues that R.C. 1336.05(B) refers only to transfers made *to* insiders.

■ We construe R.C. 1336.05(B) as applying to transfers made to insiders and obligations incurred with respect to insiders. Some of the challenged payments were made directly to Society. Society is not an insider of Science Park. Consequently, R.C. 1336.05(B) does not apply to the payments made to Society. The trial court correctly granted summary judgment on Prudential's fraudulent transfer claims as they pertain to postdefault payments made directly to Society.

■ With respect to the postdefault payments made by Science Park to Weber, Wood, and Medinger, we find that these payments were made to "insiders" because Weber, Wood and Medinger were "persons in control of" Science Park Ltd. See R.C. 1336.01(G)(3)(e). However, in order to sustain its fraudulent conveyance claims with respect to these payments, Prudential had to produce evidence that Science Park was insolvent at the time the payments were made. Under R.C. 1336.02(B), a partnership is insolvent "if the sum of the debts of the partnership is greater than the aggregate, at a fair valuation, of all of the assets of the partnership and the sum of the excess of the value of the nonpartnership assets of each general partner over the non-partnership debts of the general partner."

The United States Bankruptcy Code contains a similar definition of "insolvent." Section 101(32)(B), Title 11, U.S.Code, provides:

" '[I]nsolvent' means—with reference to a partnership, financial condition such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation—(i) all of such partnership's property, exclusive of property [transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors] and (ii) the sum of the excess of the value of each general

partner's nonpartnership property, exclusive of [transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors], over such partner's nonpartnership debts."

■ Cases interpreting the Bankruptcy Code have applied the "balance sheet" approach to determine insolvency. Under the balance sheet approach, a debtor is insolvent if its liabilities exceed its assets, excluding the value of preferences, fraudulent conveyances, and exemptions. *In re Taubman* (Bankr.Ct.Ohio 1993), 160 B.R. 964, 979. See, also, *In re Newtowne, Inc.* (Bankr.Ct.Ohio 1993), 157 B.R. 374, 380 (balance sheet analysis used to determine whether corporation was insolvent at time of allegedly fraudulent transfer).

Prudential's deposition exhibits include Science Park's 1992 balance sheet. The balance sheet contains some evidence that Science Park's liabilities exceeded its assets. Applying the balance sheet test to this case, we conclude that Prudential produced evidence of a genuine issue of material fact with respect to whether Science Park was insolvent. Accordingly, we reverse the trial court's decision with respect to the fraudulent transfer claims against Science Park for postdefault payments made to Weber, Wood, and Medinger.

■ Finally, we must determine whether the trial court properly granted summary judgment on Prudential's claim that the payments constituted "preferential transfers" under R.C. 1313.56. R.C. 1313.56 provides that transfers made with intent to hinder, delay or defraud creditors are voidable by the creditor. However, under R.C. 1313.57, the creditor must show that the transferee knew of the transferor's fraudulent intent. See *Gould v. Cooper* (1919), 15 Ohio App. 223.

To avoid summary judgment on its preferential transfer claim against Society, Prudential had to produce evidence that Society knew of Science Park's intent to defraud Prudential. Prudential presented evidence that Society knew that Science Park was having financial problems in January 1992. However, no evidence was presented to show that Society knew about Science Park's default on the mortgage with Prudential or that Society knew Science Park made payments to Society with the intent to defraud Prudential. Under the circumstances, we conclude that Prudential did not establish a triable issue of fact with respect to its claim of preferential transfers. Consequently, the trial court was correct in granting Society's motion for summary judgment on that claim.

On the other hand, we find that Prudential established a genuine issue of material fact concerning whether the postdefault payments made to Weber, Wood, and Medinger were preferential transfers. The checks representing the payments were all signed by Medinger. In addition, Prudential went forward with evidence that Wood, Weber, and Medinger made the decision to pay Society

instead of Prudential after realizing that they could not meet all of their obligations. Therefore, we reverse the trial court's grant of summary judgment on Prudential's claim that the postdefault payments to Weber, Wood, and Medinger were preferential transfers.

We affirm the trial court's entry of summary judgment on all of Prudential's claims against Society. However, the trial court's decision is reversed with respect to the fraudulent transfer and preferential transfer claims for postdefault payments made to Weber, Wood, and Medinger as well as the claims for breach of contract and breach of express trust.

The judgment is affirmed in part and reversed in part.

*Judgment accordingly.*

SPELLACY, P.J., and KARPINSKI, J., concur.