DECISION.
The defendants-appellants, Nancy L. Wallace (Wallace), Nancy L. Wallace, Inc., and Constantine A. Solomos (Solomos), appeal from the trial court's January 7, 1999, entry overruling their objections to a magistrate's decision and awarding judgment to plaintiff-appellee, John Lesick (Lesick). Appellants have each raised two assignments of error. Wallace and Nancy L. Wallace, Inc., claim (1) that the magistrate erred in finding a fraudulent transfer of assets between corporate entities, and (2) that the magistrate erred in overruling their motions for dismissal pursuant to Civ.R. 41. Solomos claims (1) that the magistrate erred in finding that his compensation was a fraudulent conveyance, and (2) that the magistrate erred in disregarding the corporate entity, holding him personally liable for a corporate debt. In order to address fully the foregoing, we have sua sponte
removed these two consolidated appeals from the accelerated calendar.
BACKGROUND
In the early 1980s, Solomos and Leonard Schwartz became business partners, operating several small corporations that provided office-administration services to various types of medical professionals. In 1986, Solomos and Schwartz formed SS Real Estate Partnership and subsequently began the combined operation of their various companies from 10361 Spartan Drive, Cincinnati, Ohio.
Throughout the 1980s, Wallace operated an accounting business in Hamilton, Ohio, doing business under various names: Wallace and Associates; Nancy L. Wallace Associates; Nancy L. Wallace 
Associates, Inc.; Wallace and Associates, Inc.; Creative Professional Services; and Creative Professional Services, Inc. During this period, Wallace held herself out to the public as a certified public accountant, although she was not licensed in Ohio.[1]
On July 1, 1988, Solomos and Schwartz formed MedGroup Management, Inc. (MGMI); however, the corporation remained dormant until late December 1989. In the fall of 1989, Wallace merged her accounting practice with several corporations owned by Solomos and Schwartz to form MedGroup, Inc. (MGI). Wallace became a fifty-percent shareholder in MGI and president of MGMI, a corporation in which she was not a shareholder.[2] Both MGI and MGMI provided professional consulting services, utilized the same employees, and operated from the same Spartan Drive address.
Lesick owned and operated Professional Management Associates, Inc., (PMAI) for a number of years. PMAI was in the business of providing tax, pension, and office-management services to medical, dental, and other health-related professionals. Lesick began to consider retirement in the late 1980s, so he entered into discussions with Wallace, Solomos, and Schwartz for the acquisition of PMAI. In the fall of 1989, discussions were ongoing with Lesick regarding the merger or buyout of PMAI, the assets of which included a substantial client list, office equipment, and a computer-billing system that was later discarded because it was of no use to MGMI. On December 30, 1989, Wallace, as president of MGMI, and Lesick executed an asset-purchase agreement of PMAI by MGMI. Lesick agreed to sell PMAI to MGMI for $70,000. MGMI gave a promissory note to PMAI, which was later assigned to Lesick, for $55,000. MGMI also gave a promissory note to Lesick personally for $15,000 in exchange for a covenant from Lesick not to compete with MGMI. Additionally, Lesick was hired by MGMI as a consultant to assist in transferring the business of PMAI to MGMI, but his employment was terminated after just four months due to MGMI's cash-flow problems. Payments to Lesick were to begin one year from the date of the asset-purchase agreement, in four annual installments.
Unbeknownst to Lesick, MGMI was insolvent at the time he signed the asset-purchase agreement. This information was not communicated to Lesick, and the record is unclear as to the amount of due diligence undertaken by Lesick prior to the sale of his corporation. Despite this, there is no dispute that MGMI did not voluntarily disclose its financial status to Lesick prior to the consummation of the transaction.
From January 1990 until February 1991, MGMI provided services to the former clients of PMAI. Wallace ran the office functions for MGMI, while Solomos had primary responsibility for dealing with MGMI's clientele in the field. Schwartz encountered great difficulty with PMAI's former clientele and soon left the corporation for personal reasons. MGMI could not adequately provide all of the required services and had to refer its pension-administration work to another individual. Further, MGMI found that extensive travel was required to keep up with the demands of the former PMAI clientele, which resulted in a severe financial drain on the corporation. To add to MGMI's cash-flow troubles during 1990, a major client discontinued its relationship with MGMI.
From the time of his termination as a consultant until February 1991, Lesick had no contact with MGMI personnel and received no payments on the promissory notes. Despite the insolvency of MGMI, it made $33,662.86 in payments to MGI, which were justified by Solomos and Wallace as payments for rent and other services provided by MGI. The only creditor not paid by MGMI was Lesick.
Lesick contacted Solomos in February 1991 to inquire when he could expect the first installment on the outstanding promissory notes. Lesick was told that MGMI did not have any money, so he would not be receiving payments on the notes. Lesick subsequently demanded payment.
Shortly following Lesick's demand for payment, MGMI's operations ceased. All of MGMI's assets, which consisted of clientele and some office equipment, were transferred to MGI. This transfer of assets was made for no consideration and without value given to MGMI. Furthermore, this transfer of assets took place while MGMI and MGI were both insolvent. To make matters worse, the cessation of corporate functions by MGMI and the transfer of assets occurred without following corporate formalities. MGMI simply stopped operating as a corporation, but MGI picked up the entire operation, including employees, and continued to perform the same functions, for the same clientele, from the same location.
At the same time MGMI was going under financially in 1990 and 1991, MGI, despite its insolvency, made numerous payments to both Wallace and Solomos. Solomos received $25,413.89 from MGI, which he justified as a repayment on a loan that he had made to one of his former corporations that had merged with MGI in 1989. Additionally, Wallace received $77,911.88 from MGI, which she too justified as a repayment on a loan that she had made to MGI, which in turn had loaned money to MGMI so that it could pay its employees.
Not long after the MGMI-MGI asset transfer, a dispute arose between Wallace and Solomos. During the summer of 1991, Wallace removed most of the office equipment, files, and clientele of MGI. MGI ceased its operations, and Wallace incorporated under the name Nancy L. Wallace, Inc., (Wallace, Inc.) to continue providing consulting services to her clients, which included all of the former PMAI clientele. Wallace also employed the former MGI personnel. Solomos apparently went to work for one of his former clients in the Dayton, Ohio, area.
Once again, no consideration or value was paid to MGI for the transfer of the corporate assets, including the former PMAI clientele, to Wallace, Inc. No corporate formalities were followed in winding up MGI as a corporation, or in making the asset transfer from MGI to Wallace or Wallace, Inc. Of interest is the fact that this transfer of assets from MGI to Wallace and Wallace, Inc., occurred within one month after Lesick filed suit to recover the $70,000 owed to him under the promissory notes, and four months after the MGMI-MGI transfer. Wallace, Inc., subsequently ceased operations prior to the end of 1991.
PROCEDURAL POSTURE
Lesick alleged in his complaint, filed June 27, 1991, that the MGMI-MGI asset transfer took place while the corporations were insolvent and to avoid paying the $70,000 owed to him on the promissory notes. Lesick amended his complaint on August 29, 1991, to include a claim of corporate-successor liability against both MGI and Wallace, Inc., and a claim that Wallace and Solomos were personally liable for the $70,000, because their fraudulent acts warranted the disregarding of the separate existence of the corporations owned and controlled by them. Lesick did not, however, make Schwartz a party to this litigation.
Throughout the latter part of 1991, and continuing until the trial of this matter in 1996, all of the defendants hampered Lesick's efforts to obtain discovery of essential matters in this case. In particular, Wallace continued to play "hide the pea" with her evasive answers to interrogatories and repeated failures to respond to requests for production of documents. Eventually, the trial court ordered Wallace to answer the interrogatories and produce the requested documents.
Lesick's claims were tried before a magistrate from the tenth to the fourteenth of March 1997. The parties then submitted their closing arguments in writing. The magistrate issued a written decision on May 15, 1997, and an amended decision on June 24, 1997, holding defendants personally liable to Lesick for $70,000 based upon fraudulent transfers and a piercing of the corporate veils of MGMI, MGI, and Wallace, Inc. The trial court, also on June 24, 1997, placed on its journal an entry adopting the decision of the magistrate.
The defendants filed an appeal with this court under case numbers C-970590 and C-970612. This court affirmed the judgment of the trial court on September 25, 1998, noting that the defendants had failed to file timely objections to the magistrate's decision pursuant to Civ.R. 53(E)(3). Subsequently, the defendants moved the trial court, pursuant to Civ.R. 60, for relief from the June 24, 1997, judgment to allow the defendants an opportunity to file objections to the magistrate's decision. This motion was granted, and the objections were filed. On January 7, 1999, the trial court placed on its journal an entry overruling the objections to the magistrate's decision. Thus, in the instant appeal, the claims of error raised before this court may now properly be determined on the merits.
OHIO'S UNIFORM FRAUDULENT TRANSFER ACT
In 1990, the General Assembly made substantial amendments to the Ohio Uniform Fraudulent Transfer Act (the Act), R.C. 1336.01et seq. Although the asset-purchase agreement between Lesick and MGMI occurred prior to these amendments, the acts alleged in Lesick's complaint all occurred subsequent to the amendment of the Act. Therefore, we are concerned only with analyzing the case under the Act in its present form.
Pursuant to the Act, fraud is imputed to the debtor when the statutory elements have been met. See Comer v. Calim (1998),128 Ohio App.3d 599, 716 N.E.2d 245; Locafrance United States Corp.v. Interstate Distrib. Services, Inc. (1983), 6 Ohio St.3d 198,451 N.E.2d 1222. To succeed on a fraudulent-transfer claim, the creditor need not prove the elements of common-law fraud set forth by the Supreme Court of Ohio in Belvedere Condominium Owners'Assn. v. R.E. Roark Cos., Inc. (1993), 67 Ohio St.3d 274, 277,617 N.E.2d 1075. See Comer, supra. A review of the statutes comprising the Act follows.
For a creditor whose claim against the debtor arose before the transfer took place, R.C. 1336.05 provides the statutory framework under which the creditor must prove its case. R.C.1336.05(A) provides that a transfer is fraudulent when a debtor transfers assets, without receiving a reasonably equivalent value in exchange for the transfer, while the debtor is insolvent. Additionally, a transfer is fraudulent if the debtor, while insolvent, transfers assets to an insider. See R.C. 1336.05(B); see, also, Prudential Ins. Co. of Am. v. Science Park, L.P. (1995), 106 Ohio App.3d 823, 829, 667 N.E.2d 437, 441. An insider includes, inter alia, directors, officers, partners, persons in control of a corporation, relatives, and corporations of which the debtor is a director, officer, or person in control. See R.C.1336.01(G); Prudential Ins. Co. of Am., supra; Abood v. Nemer
(1998), 128 Ohio App.3d 151, 713 N.E.2d 1151.
A creditor may prove its claim of a fraudulent transfer independent of when the creditor's claim arose by satisfying the elements of R.C. 1336.04. Abood, supra. R.C. 1336.04(A) provides that a transfer is fraudulent if the debtor made a transfer of assets without receiving a reasonable value, and either (1) the debtor was engaged or about to be engaged in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to that business or transaction; or (2) the debtor intended to believe, or believed or reasonably should have believed that he would become, insolvent. Id. The Act also provides for liability if the creditor proves, via numerous statutory factors, also referred to as "badges of fraud," that the debtor had the actual intent to defraud the creditor by transferring assets. See R.C. 1336.04(A)(1); see, also, Stein v.Brown (1985), 18 Ohio St.3d 305, 480 N.E.2d 1121; Crocker v. Hood
(1996), 113 Ohio App.3d 478, 681 N.E.2d 460; Abood, supra; Fesmanv. Berger (Dec. 6, 1995), Hamilton App. No. C-940400, unreported;K-Swiss, Inc. v. Cowens Sports Center, Inc. (Nov. 8, 1995), Greene App. No. 95-CA-48, unreported.
Whether the debtor was insolvent at the time of the transfer is an essential element for determining liability under R.C.1336.05. Under the balance-sheet approach for determining whether a debtor was insolvent, the creditor need only prove that the debtor's liabilities exceeded the debtor's assets, excluding the value of preferences, fraudulent conveyances, and exemptions. SeePrudential Ins. Co. of Am., supra; see, also, R.C. 1336.02.
Under the Act, a transfer is defined in this manner:
 every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.
R.C. 1336.01(L). An asset is the property of a debtor, and property is "anything that may be the subject of ownership." R.C.1336.01(B) and (J). An asset is not, however,
 property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors, or that has been transferred in a manner making the transfer fraudulent under section 1336.04
or 1336.05 of the revised code.
R.C. 1336.02(C)(1). Customer accounts, such as those sold by PMAI to MGMI in this case, which provide a potential, or pecuniary, value to a corporation, are assets of a corporation for purposes of the Act. See Locafrance United States Corp., supra; Link v.Leadworks Corp. (1992), 79 Ohio App.3d 735, 745, 607 N.E.2d 1140,1147.
Once the creditor proves the requisite elements, the debtor then has the opportunity to rebut the presumption of a fraudulent transfer by demonstrating that the transaction was made for fair value or consideration. See R.C. 1336.08; see, also,Cardiovascular Thoracic Surgery of Canton, Inc. v. DiMazzio
(1987), 37 Ohio App.3d 162, 524 N.E.2d 915; Abood, supra. If the debtor fails to establish that the transaction was made for reasonably equivalent value, the creditor may obtain one of the following: (1) an avoidance of the transfer; (2) an attachment or garnishment against the asset transferred or other property of the debtor; (3) an injunction against further disposition of the asset transferred or other property of the debtor; (4) an appointment of a receiver to take charge of the asset transferred; or (5) any other relief that the circumstances of the case may require. See R.C. 1336.07(A); see, also, Locafrance United States Corp., supra;Abood, supra; Dolce v. Lawrence (Dec. 22, 1995), Lake App. No. 95-L-038, unreported. Furthermore, the court may order the party that committed the fraudulent transfer to pay attorney fees and punitive damages. See Locafrance United States Corp., supra.
Liability for the debts of one corporation do not normally follow through to a successor corporation. See Flaugher v. ConeAutomatic Machine Co. (1987), 30 Ohio St.3d 60, 507 N.E.2d 331. However, liability for a fraudulent transfer of assets from the debtor to a successor corporation will be extended to the successor corporation if the successor (1) expressly or impliedly agrees to assume such liability; (2) the asset transfer is a de facto merger or consolidation; (3) the successor corporation is merely a continuation of the debtor corporation; or (4) the asset transfer was done to escape liability. See Flaugher, supra; WelcoIndustries, Inc. v. Applied Cos. (1993), 67 Ohio St.3d 344,617 N.E.2d 1129; Kuempel Serv., Inc. v. Zofko (1996), 109 Ohio App.3d 591,672 N.E.2d 1026. If there is competent and credible evidence in the record to support the trial court's findings that a fraudulent transfer occurred, and that corporate-successor liability should be imposed, we will affirm that finding. SeeSeasons Coal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77,461 N.E.2d 1273; C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 376 N.E.2d 578; Duvall v. Time WarnerEntertainment Co., LP (June 25, 1999), Hamilton App. No. C-980515, unreported.
PIERCING THE CORPORATE VEIL
Because, under the fraudulent-transfer act, successor corporations may be held liable for the debts of the original corporation, the question arises as to what, if any, liability may be imposed upon the officers, directors, and shareholders of the successor corporation. Corporations are formed in order to facilitate business transactions and to shield officers, directors, and shareholders from personal liability for torts or breaches of contract committed by the corporations. SeeBucyrus-Erie Co. v. General Products Corp. (C.A.6, 1981),643 F.2d 413; Belvedere Condominium Unit Owners' Assn. v. R.E. RoarkCos., Inc. (1993), 67 Ohio St.3d 274, 617 N.E.2d 1075 (citingState ex rel. Atty. Gen. v. Standard Oil Co. [1892], 49 Ohio St. 137,30 N.E. 279, paragraph one of the syllabus). That corporate veil, or shield from liability, may be pierced or
 disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.
Belvedere, supra, at paragraph three of the syllabus. There is no precise test to determine whether the elements required to pierce the corporate veil have been satisfied, and each case should be "regarded as `sui generis' and decidable on its own facts."Bucyrus-Erie Co., supra, at 418. Upon review of a trial court's decision to pierce the corporate veil, we will affirm the judgment of the trial court if there is competent and credible evidence to support the trial court's conclusion that the officers, directors, or shareholders should be held personally liable for the debts of their corporation. See C.E. Morris Co., supra; Kuempel Serv.,Inc., supra, at 598, 672 N.E.2d at 1030.
Under the foregoing framework for the Act, corporate-successor liability, and piercing the corporate veil, we now review the specific assignments of error raised by the appellants.
THE WALLACE ASSIGNMENTS OF ERROR
In Wallace's first assignment of error, she claims that the magistrate erred in finding that there was a fraudulent transfer of assets from MGMI to MGI and from MGI to Wallace, Inc. We disagree.
The assets of MGMI were transferred to MGI in 1991. The assets consisted of a client list, various items of office equipment, and a computer-billing system. At the time of the transfer, MGMI was insolvent and owed Lesick $70,000. Nothing of value was exchanged for the assets of MGMI. Thus, the asset transfer was a fraudulent transfer as defined in the Act.
MGI can be held liable for the debts of MGMI under the corporate-successor-liability theory. A fraudulent transfer was committed. The transfer of assets from MGMI to MGI was, by Solomos's own admission at trial, a consolidation of accounts under MGI and a mere continuation of MGMI's business.
Although Wallace claims that the clients were of no value, the clients did produce a revenue stream for MGMI. Trial testimony was elicited from Solomos that, during 1990, MGMI had gross receipts of over $500,000, income that was generated by work performed for the clients of MGMI. Also elicited from Solomos was the fact that the clients were never considered an asset of MGMI, despite the fact that the clients were the basis for the purchase of PMAI. Therefore, the assertion that MGMI's client list had no value is absurd.
During the summer of 1991, MGI ceased its operations and the assets were transferred to Wallace and Wallace, Inc. This transfer also took place while MGI was insolvent and without fair consideration given to MGI for the client list. Under corporate-successor liability for fraudulent acts, and the mere continuation of MGMI's business under a new corporate entity, the debts of MGMI were imputed to MGI, and subsequently imputed properly to Wallace and Wallace, Inc. Thus, we hold that there was a substantial amount of competent and credible evidence (1) to support the magistrate's finding that the transfer of assets from MGI to Wallace and Wallace, Inc., was a fraudulent transfer pursuant to the Act; and (2) to impose corporate-successor liability upon those corporations for the debt owed to Lesick. Wallace's first assignment of error is overruled.
In Wallace's second assignment of error, she claims that the magistrate erred in overruling her Civ.R. 41(B)(2) motions for involuntary dismissal of Lesick's case. In order to succeed on a Civ.R. 41(B)(2) motion, the defendant must show that the plaintiff has failed to prove his case by a preponderance of the evidence. See Harris v. Cincinnati (1992), 79 Ohio App.3d 163,607 N.E.2d 15; see, also, Krysa v. Sieber (1996), 113 Ohio App.3d 572, 579,681 N.E.2d 949, 953. The trial court weighs the evidence, resolves conflicts therein, and may find for the defendant if the plaintiff has not demonstrated a right to relief. Id.
Wallace claims that there was a failure of proof regarding the value of the client-list asset that was transferred from MGMI to MGI, and subsequently to Wallace and Wallace, Inc. Additionally, Wallace claims that there was insufficient evidence to allow a piercing of the corporate veil to hold Wallace personally liable for the debt owed to Lesick.
For the reasons discussed above pertaining to the appropriateness of the magistrate's finding of a fraudulent transfer, we hold that Lesick had demonstrated that the client list, while intangible, had a pecuniary value to MGMI, MGI, Wallace, and Wallace, Inc. As for the finding that Wallace was personally liable, Lesick proved that a fraudulent transfer occurred, and that Wallace committed a fraudulent act by signing the asset-purchase agreement with Lesick as an officer of MGMI, when in fact she was not an officer of MGMI. He further proved that Wallace and Solomos exercised such control over MGMI that it did not have an existence of its own. Lesick also proved that the failure of MGMI to pay its debt to him was the direct result of actions taken by Wallace and Solomos. Since there is competent and credible evidence to support the magistrate's findings, we conclude that the magistrate was correct in overruling the Civ.R. 41(B)(2) motions. Thus, we overrule Wallace's second assignment of error, and we affirm the judgment against Wallace and Wallace, Inc.
THE SOLOMOS ASSIGNMENTS OF ERROR
In Solomos's first assignment of error, he claims that the trial court erred in finding that the compensation paid to him by MGI was a fraudulent conveyance. We disagree.
The trial court found that Solomos received payments on a loan that Solomos had made to MGI while MGI made no payments on its obligation to Lesick as a successor corporation. Solomos was not able to demonstrate that the payments made to him were not repayments on that loan. Solomos contends that these payments, regardless of whether they were repayments on a loan, did not constitute a fraudulent conveyance of assets; however, the definition of a transfer under R.C. 1336.01(L) includes the "payment of money." Since MGI's assets included client lists that generated money, the subsequent payment of that money to Solomos, in the form of loan repayments, became a transfer of assets. Since Solomos was an insider, this transfer of money to Solomos was a fraudulent conveyance. Solomos expends some effort in his brief in an attempt to justify the payments as compensation rather than repayment on a loan. Through trial testimony and evidence introduced at trial, the payments made to Solomos were at all times claimed to be repayments on a loan. Solomos cannot now claim that these payments were simply salary payments in a further attempt to avoid liability. Solomos's first assignment of error is overruled.
In Solomos's second assignment of error, he claims that the magistrate erred in piercing the corporate veil and holding him personally liable for the debt owed to Lesick. In this case, the magistrate found that Solomos was a 50% shareholder in MGMI and MGI, that Solomos was the "alter ego" of MGMI such that MGMI had no will of its own, that the asset transfers took place without following corporate formalities, and that the control exercised by Solomos over MGMI and MGI was for the purpose of defrauding Lesick, as demonstrated by the fact that all creditors were paid with the exception of Lesick. The final element of the Belvedere
test was satisfied when Lesick suffered the loss of the debt owed to him as a direct result of the control exercised and fraudulent acts committed by Solomos. Since there is competent and credible evidence in the record to support the findings made by the magistrate, Solomos's second assignment of error is overruled, and the judgment against Solomos is affirmed.
Judgment affirmed.
 Doan, P.J., and Sundermann, J., concur.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Decision.
[1] In 1993, Wallace was fined by the IRS for fraudulent tax evasion in failing to file timely and accurate tax returns for tax years 1986 and 1987. Wallace v. Commissioner (1993), 66 T.C.M. (CCH) 1770. Further, Wallace was found guilty of theft or embezzlement from an employee benefit plan, in violation of Section 664, Title 18, U.S. Code, on August 19, 1996, and sentenced to fifteen months' incarceration followed by two years' probation.United States v. Wallace (Aug. 19, 1996), S.D.Ohio No. CR-1-95-97, unreported (Sentencing Memorandum Order).
[2] Wallace made numerous claims in the trial court, including her deposition testimony on March 13, 1996, that she "had nothing to do with MedGroup Management, Inc." The record reveals, however, that she signed the asset-purchase agreement with Lesick as president of MGMI. Furthermore, numerous financial transactions appear in the record that bear her signature. Additionally, the record contains evidence that Wallace ran the day-to-day operations of MGMI until it became defunct.